14-1505SAG  to  14-1509SAG

14-1510SAG

thru

14-1523SAG

# EXHIBIT 1

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEZIURE AND ARREST WARRANTS

### I.    AFFIANT AND EXPERTISE

Special Agent Michelle Zamudio, after being duly sworn, states as follows:

1.    I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.    I have been a Special Agent with the DEA since January 2012. I am currently assigned to the Heroin Task Force Group (Group 52) in the DEA's Baltimore District Office (hereinafter DEA Baltimore). Prior to my current assignment, I served as a Customs and Border Protection Officer (CBPO) with the Department of Homeland Security for approximately three years. During that time, I was assigned to Washington Dulles International Airport in Sterling, Virginia. I received 16 weeks of training at the Federal Law Enforcement Training Center in Brunswick, Georgia. Prior to my assignment as a CBPO, I served as a University Police Officer for the State University of New York for approximately 2 years. During that time I was assigned to Stony Brook University in Stony Brook, New York. I received 24 weeks of training at the Nassau County Police Academy in Massapequa, New York. In my current assignment with the DEA, I have completed a 16 week DEA Basic Agent training program at the Drug Enforcement Administration Training Academy in Quantico, Virginia. During this training, I have received detailed training, both academic and practical application, in the areas of informant handling/debriefing, interview and interrogation techniques,

1

undercover techniques, drug packaging, pricing, importation, and trafficking methods. In addition, I have received both academic and practical application training in surveillance and counter surveillance techniques/methods. I have received legal instruction in Federal drug conspiracy laws, preparing drug affidavits, the Controlled Substances Act, Fourth Amendment searches and seizures, Federal Rules of Evidence, and the execution of search warrants. In April 2013, I completed "Top Gun," an undercover Drug Law Enforcement Training for narcotics investigators and prosecutors at the Northeast Counterdrug Training Center in Fort Indiantown Gap, Pennsylvania.

3.     I have participated in the execution of numerous search and seizure warrants pertaining to controlled dangerous substances. As a result, I have been involved in the seizure of heroin, marijuana, crack cocaine, cocaine, packaging materials, and firearms. I have also participated in numerous debriefings of narcotic traffickers, cooperating individuals, and sources of information. During these debriefings, I have become familiar with brand names and terminology used by drug dealers. In addition, I have testified before grand juries on a number of occasions, resulting in federal indictments for defendants. I have also participated in an investigation involving the laundering of money.

4.     I have been the primary or secondary affiant on prior Maryland State wiretap investigations, and have participated in other wiretap investigations as either a member of the surveillance team or monitor, where I had had the opportunity to listen to and interpret tens of thousands of phone calls as they pertained to various aspects of the illegal narcotics trade.

5.      Through my training and prior experience in drug trafficking investigations and arrests; I am familiar with the actions, traits, habits, and terminology utilized by drug traffickers. I am familiar with the ways in which narcotic traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of cellular telephones and the Internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions. During my time in law enforcement, I have learned the following:

a.      Persons involved in the illegal distribution of CDS keep and maintain records of their various activities. Experience in similar cases has established that such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms. Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators.     The aforementioned items are kept in locations that are considered safe by the drug traffickers such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them. I know that drug traffickers often have several residences decreasing the likelihood of detection by law enforcement.

b.      Persons involved in the illicit distribution of CDS, due to advancement in technology, may be utilizing computers or other electronic storage media to store the records listed above.

c.      I also know, based on training and experience, that large scale drug traffickers must maintain on hand large amounts of United States currency in order to maintain and to finance their ongoing narcotics business. Based on training and experience I know that persons involved in large scale drug trafficking conceal in their residences currency, financial instruments, and evidence of financial transactions relating to narcotics trafficking activities.

d.      Persons involved in the illicit distribution of CDS utilize cellular telephones, pagers and other electronic communications devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals.

3

e.      Persons involved in the illicit distribution of CDS take or cause to be taken photographs of themselves, their associates, their property and their product. These traffickers usually maintain these photographs in their possession, in locations such as their homes, vehicles, electronic devices, or on their person.

f.      I know, based on training and experience, that drug traffickers commonly have in their possession, that is, on their person, in their residences and/or businesses, firearms and other weapons.  Said firearms and weapons are used by the traffickers to protect and secure their large amounts of narcotics and United States currency from loss to law enforcement agents or other members of the criminal element that are motivated by greed.

g.      I know, based on training and experience, that drug traffickers commonly have in their possession, that is, on their person, in their residences and/or businesses, packaging material, cutting agents, digital scales, and other items used in the preparation and packaging of controlled substances.

## II.     PURPOSE OF THE AFFIDAVIT

6.      This Affidavit is submitted in support of search and seizure warrants and arrest warrants pertaining to violations of the Controlled Substances Act, Section 801 et seq. of the United States Code. Since this Affidavit is being submitted for this limited purpose, I have not included every detail of the investigation that has been conducted to date.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause.  I have not, however, excluded any information known to me that would defeat a determination of probable cause.  The information contained in this Affidavit is based upon my personal knowledge, a review of documents and other evidence, and conversations with other law enforcement officers and other individuals.   All conversations and statements described in this Affidavit are related in substance and in part unless otherwise indicated.

7.      As set forth in further detail below, since approximately November of 2013, DEA Group 52 (DEA Baltimore) and the Baltimore Police Department hereinafter

4

the BPD) has been conducting an investigation into the Fred BROOKS drug trafficking organization (hereinafter BROOKS DTO), which had been supplying large quantities of heroin to distributors in the Baltimore, Maryland area.

8.      DEA investigators in the New Orleans Division Office (hereinafter "DEA New Orleans") have also been conducting an investigation into the BROOKS DTO and have determined that BROOKS resides in Houston, Texas. On February 8, 2014, DEA New Orleans obtained a federal court order to intercept communications over (202) 431-7100, utilized by BROOKS (hereinafter "BROOKS' TELEPHONE #1"). DEA New Orleans has also obtained federal court orders to intercept communications over cellular phones (210) 776-5814, utilized by BROOKS (BROOKS' TELEPHONE #2) and (832) 668-6409, utilized by BROOKS (BROOKS' TELEPHONE #3.) Based on the investigations of DEA New Orleans and DEA Baltimore, investigators have determined that BROOKS is engaged in the trafficking of multi-kilogram shipments of heroin from a Mexican source of supply.

9.      Investigators have learned that BROOKS is communicating with Baltimore-based drug traffickers who appear to be distributing kilogram quantities of heroin and depositing the drug proceeds into various banks in Baltimore, Maryland. A review of telephone records obtained by DEA New Orleans showed 92 communications between (443) 949-2476 (a telephone number associated with BROOKS) and (312) 502-7808 (a telephone number associated with Sean WILSON) between September 30, 2013, and October 22, 2013. In addition, investigators learned that BROOKS has been communicating with an individual identified as Timothy MCDERMOTT.

10.     On March 10, 2014, your affiant obtained a federal court order to intercept wire and electronic communication over (304) 279-3468, utilized by MCDERMOTT, (hereinafter MCDERMOTT TELEPHONE #1).  On March 19, 2014, MCDERMOTT switched his number to (304) 283-7869 (hereinafter MCDERMOTT TELEPHONE #2), which number was also intercepted via the court-ordered wiretap.  Through intercepted communications over MCDERMOTT TELEPHONES #1 and 2, investigators learned that MCDERMOTT has been traveling to Chicago, Illinois, on a regular basis at the direction of BROOKS to meet with unknown Hispanic males in order to obtain large amounts of drugs.

11.     Through    intercepted    communications    over    MCDERMOTT TELEPHONES #1 and 2, and surveillance, investigators learned that MCDERMOTT was transporting these drugs from Chicago, Illinois, to Jason PAYNE, in Youngstown, Ohio, and to Phillip WHEELER, in Baltimore, Maryland.

12.     On March 28, 2014, investigators intercepted communication over MCDERMOTT TELEPHONE #1 that revealed MCDERMOTT was meeting with an unknown male, later identified as James BRYANT, a/k/a "Country" to distribute an amount of heroin.  Investigators conducted surveillance of MCDERMOTT and observed him meet with BRYANT.  After the meet, investigators followed BRYANT and directed uniformed officers to conduct a traffic stop on the vehicle.  During this stop, officers conducted a search of BRYANT's vehicle and seized approximately two kilograms of heroin.

13.     During the month of April 2014, investigators identified WILSON'S telephone as (407) 418-9745 and obtained an order to intercept communication over this

6

telephone on May 19, 2014 through the Circuit Court for Baltimore, Maryland (hereinafter WILSON TELEPHONE #2). During the interception period over this telephone investigators learned that WILSON was being supplied large amounts of heroin on a routine basis. Investigators then began intercepting communications between WILSON and BROOKS, who was utilizing (202) 746-4336 (hereinafter BROOKS' TELPHONE #4).

14.     On June 2, 2014, investigators obtained a court order through the Circuit Court for Baltimore City, Maryland, to begin interception of BROOKS' TELEPHONE #4. During the interception of this telephone, investigators learned that BROOKS was in contact with numerous individuals throughout the United States and was involved in the coordination of drug trafficking to several different jurisdictions, New York, Maryland, and New Orleans. Investigators have intercepted communication between BROOKS and multiple sources of supply (SOS) regarding possible narcotics transactions.

15.     In addition, your Affiants submitted and received approval for multiple trap and trace orders and GPS tracking orders for targeted subjects identified during this investigation. Information obtained during and as a result of these orders led to the identification of the target locations discussed herein as locations from which evidence might be obtained, and the identification of the subjects for whom your Affiant is requesting arrest warrants.

## III.     TARGET LOCATIONS AND PERSONS TO BE ARRESTED AND/OR SEARCHED

16.     The following target locations and vehicles have been utilized by members of or are associated to the BROOKS DTO during the course of the conspiracy and your Affiant is requesting search warrants for:

| Reference Number | Address | Target Subject(s) | Corresponding Paragraphs |
|---|---|---|---|
| 1 | 8809 Falcon Ridge Drive Randallstown, MD 21133<br><br>Vehicle: 2004 Jeep Grand Cherokee Maryland Tag 40419CB VIN# 1J4GW48N74C415920<br><br>2012 Jeep Grand Cherokee Maryland Tag 4AP2892 VIN# 1C4RJFDJXCC164742<br><br>2010 Cana Motorcycle Maryland Tag D58657 VIN# 2BXJAWA16AV000112 | Sean WILSON FBI # 534565KA9 | 18-60 |
| 2 | 3854 Twin Lakes Court Windsor Mill, MD 21244<br><br>Vehicle: 2004 Jeep Grand Cherokee Maryland Tag 40419CB VIN# 1J4GW48N74C415920<br><br>2012 Jeep Grand Cherokee Maryland Tag 4AP2892 VIN# 1C4RJFDJXCC164742<br><br>2010 Cana Motorcycle Maryland Tag D58657 VIN# 2BXJAWA16AV000112 | Sean WILSON FBI # 534565KA9 | 18-60 |
| 3 | 911 Pirates Court, Edgewood,   MD 21040<br><br>Vehicle: 2009 Honda Accord Maryland Tag A241700 VIN# 1HGCS12829A008027 | Phillip WHEELER FBI# 404127JB9<br><br>Timothy MCDERMOTT FBI #118829PA8 | 61-92 |
| 4 | 128 North Hilton Street Baltimore, MD 21229 | James BRYANT FBI# 583854JA7 | 93-126 |

| | | | |
|---|---|---|---|
| | Vehicle: 2000 Chevy Silverado<br>Maryland Tag 34X809<br>VIN# 1GCGK29U3YE429433 | Timothy<br>MCDERMOTT<br>FBI #118829PA8 | |
| 5 | 3905 Shannon Drive, Baltimore,<br>MD 21213<br><br>Vehicle: 2000 Chevy Silverado<br>Maryland Tag 34X809<br>VIN# 1GCGK29U3YE429433<br><br>White Freightliner Tractor<br>Trailer<br>U.S.D.O.T. # 191915 | James BRYANT<br>FBI# 583854JA7<br><br>Timothy<br>MCDERMOTT<br>FBI #118829PA8 | 93-126 |
| 6 | 9007 Balin Court, Pikesville,<br>MD 21208<br><br>Vehicle: 2011 Lexus Maryland<br>Tag 2BE6633<br>VIN# JTHBK1EG4B2454966 | Carvell JONES<br>FBI# 435428JA8 | 127-149 |
| 7 | 14 Pellinore Court<br>Pikesville, MD 21208 | Sean WILSON<br>FBI # 534565KA9<br><br>Carvell JONES<br>FBI# 435428JA8 | 127-149 |

17.   The following is a list of the TARGET SUBJECTS, who, based upon the information contained herein, there is probable cause to arrest for violations of Title 21 of the United States Code § 846, to wit: conspiracy to distribute and possession with the intent to distribute controlled substance:

a.   Timothy MCDERMOTT, a/k/a "Gringo" a white male with a date of birth (DOB) of September 14, 1971 (MCDERMOTT). MCDERMOTT has been identified as the user of telephone numbers (304) 279-3468 (MCDERMOTT TELEPHONE #1) and (304) 283-7869, (MCDERMOTT TELEPHONE #2). MCDERMOTT has previous convictions for assault with attempt to murder, burglary, handgun on person, robbery, and possession with intent to distribute cocaine. In 1994, MCDERMOTT was convicted of conspiracy to distribute heroin in the U.S. District Court for the District of Maryland, along with co-defendant BROOKS. MCDERMOTT was sentenced to three years in prison. In 2003, MCDERMOTT was arrested in Baltimore, Maryland, on charges related to possession with intent to distribute heroin, cocaine, and marijuana, and handgun on person. MCDERMOTT was sentenced by the Circuit Court for Baltimore City to twelve years in prison with five years suspended and two years of probation. Probable cause specific to this individual may be found in ¶¶ 61-126;

b.   Phillip WHEELER, a black male with a DOB of July 28, 1974 (WHEELER). WHEELER has been identified as the user of telephone number (410) 322-1655, (WHEELER TELEPHONE #1). WHEELER has no prior criminal convictions. Probable cause specific to this individual may be found in ¶¶ 61-92;

c.   Sean WILSON, a black male with a DOB of December 16, 1968. (WILSON). WILSON has been identified as the user of telephone numbers (224) 250-7402 (WILSON TELEPHONE #1) and (407) 418-9745 (WILSON Telephone #1); In 1990, WILSON was arrested in Baltimore for conspiracy possession and distribution of heroin and cocaine. He was ultimately convicted in the U.S. District Court for the District of Maryland. WILSON received a 188-month sentence. Probable cause specific to this individual may be found in ¶¶ 18-60, 127-149;

d.   James BRYANT a/k/a "Country" a black male with a DOB of October 30, 1967 (BRYANT). In July 1988, BRYANT was arrested for possession of cocaine in Baltimore, Maryland. In December 1989, BRYANT was arrested in Baltimore, Maryland for possession of cocaine and possession of marijuana. In March 1991, BRYANT was arrested for CDS supply wholesale cocaine in Baltimore, Maryland. BRYANT was found guilty of

10

this charge and was given a sentence of ten years of which eight years was suspended and given probation of 5 years. In July 1991, BRYANT was arrested for distribution of cocaine in Baltimore, Maryland. In November 1993, BRYANT was arrested for possession of cocaine, marijuana, and paraphernalia by the Maryland State Police. In April 1998, BRYANT was arrested for CDS violation/possession of crack cocaine in Baltimore, Maryland. In December 2001, BRYANT was arrested for assault second degree in Baltimore, Maryland. On March 28, 2014, BRYANT was arrested in Baltimore, Maryland for possession with intent to distribute approximately two (2) kilograms of heroin. Probable cause specific to this individual may be found in ¶¶ 93-126;

e. Carvell JONES a/k/a "Cuz," a black male with a DOB of March 25, 1970 (JONES). In 1990, JONES was convicted of Conspiracy to Distribute Heroin and received a sentence of 188 months. Probable cause specific to this individual may be found in ¶¶ 126-149.


## IV.   PROBABLE CAUSE RELATING TO THE SEARCH OF THE TARGET LOCATIONS AND THE ARREST OF TARGET SUBJECTS

### SUBJECT PREMISES # 1 and #2 and Vehicles

Location:   8809 Falcon Ridge Drive, Randallstown, MD 21133
            3854 Twin Lakes Court, Windsor Mill, MD 21244

Target Subject(s): Sean WILSON FBI# 534565KA9

Vehicle(s):

2004 Jeep Grand Cherokee Maryland Tag 40419CB VIN# 1J4GW48N74C415920
2012 Jeep Grand Cherokee Maryland Tag 4AP2892 VIN# 1C4RJFDJXCC164742
2010 Cana Motorcycle Maryland Tag D58657 VIN# 2BXJAWA16AV000112


18. As discussed below, investigation and physical surveillance, as well as wiretaps, have demonstrated that Sean WILSON, Timothy MCDERMOTT, Phillip WHEELER, and James BRYANT are members of the drug conspiracy at issue herein.

19. On March 28, 2014, BRYANT was arrested by the Maryland Transportation Authority Police with approximately two kilograms of heroin shortly after meeting with MCDERMOTT.

11

20.   Three days later, on March 31, 2014, at approximately 2:46 p.m., agents intercepted an outgoing call from cellular phone number (210) 776-5814 (BROOKS TELEPHONE #2) to cellular phone number (224) 250-7402, utilized by Sean WILSON (WILSON TELEPHONE #1).   Investigators confirmed WILSON to be the user of WILSON TELEPHONE #1 during a surveillance operation on April 3, 2014, see paragraph 32 for information).   During the conversation, BROOKS stated, "Like I said, that's a whole another situation."   WILSON stated, "Oh okay."   BROOKS replied, "That already, I just to make sure that there ain't no bigger happenings that I don't see and I'm being stupid about.   You know what I mean.   I just want...."   WILSON stated, "Right, right, yeah, yeah, yeah, alright.   Well, whatever you feel, whatever but I'm saying that, know that even if 'Fruit Loops' comes this way, you know what I'm saying, if he comes this way, things are still cool on this end, he already knows, like I said, he won't know unless I call him and he'll just move on if I call him."   BROOKS replied, "Okay."   WILSON stated, "but other than that... Oh... I will tell you tell if dude when he comes through here or whatever, you know what I'm saying, he needs a bag... he needs to put the whatever he's driving, he will park right on the corner or go all way up in the garage, don't pull right there and then get out and go in, that's what he did."   BROOKS replied, "Okay."   WILSON stated, "You know what I'm saying, we don't want, you know what I'm saying."   BROOKS, replied, "Yeah."   WILSON stated, "He can pull all the way in or park the corner and walk around.   I showed him the way can get in so that way it won't be nobody even looking."   BROOKS replied, "Right."   WILSON stated, "This yard is under surveillance 24 hours and that's how I knew that he just parked out front and he parked.... He could have backed all the way in and I don't know if somebody

12

was with him, you or what, I don't known but nevertheless that's safe. You know what I'm saying." BROOKS replied, "Okay, yeah." WILSON stated, "So that's why I was calling you to make sure, but I don't leave till Friday. I got to go, I start school but like I said if you call me, and say yeah man, he already stopped through the office, then my cousin will know how to go and straighten the office up." BROOKS replied, "Alright." WILSON replied, "So just whatever you decide, whatever, it's alright with me." BROOKS replied, "Alright." WILSON stated, "And I'll call you in a little bit when I get the rest of the checks." BROOKS replied, "Alright."

21.  Based on my training, knowledge and experience, I believe BROOKS is informing WILSON that there is a situation going on and he wants to make sure everything is ok before he continues with any future drug transactions. I believe BROOKS is referring to the arrest of James BRYANT. I also believe WILSON is trying to reassure BROOKS that everything is ok on his end and that "Fruit Loops" can meet with him at a secure location that has "24 hour surveillance." (NOTE: "Fruit Loops" or "Fruity" is a derogatory term used to describe males who may act in a flamboyant, bouncy, or feminine way.)   After reviewing intercepted communications of Phillip WHEELER over MCDERMOTT TELEPHONE #1, WHEELER appears to have a feminine sounding voice and I believe that WILSON is referring to WHEELER as "Fruit Loops." I believe WILSON then asks BROOKS to inform WHEELER to park either at the corner or inside the garage at the location where WILSON and WHEELER are planning to meet. I also believe that WILSON is telling BROOKS that the proposed meet location has "24 hour surveillance" and therefore WHEELER can safely meet him there. At the end of the conversation, I believe WILSON is telling BROOKS that he will

call him when he gathers up the rest of the money ("checks") from the drug sales. Based on subsequent investigation, I believe the location WILSON is referring to is 14 Pellinore Court, Pikesville, MD, see paragraphs 127-149 for information).

22.   On March 31, 2014 at approximately 10:56 p.m., Fred BROOKS, utilizing BROOKS TELEPHONE #2, received an incoming text message from WILSON TELEPHONE #1. The content of the message was "Thatl astc heck was 76880 he pic up thurs." I believe that in this text message WILSON was utilizing coded language to tell BROOKS that the last amount of the outstanding drug debt ("I astc heck") owed to BROOKS from WILSON was for $76,880.00.   WILSON further explains, utilizing coded language, that WHEELER ("he") will pick up the currency on Thursday ("thurs").

23.   On April 01, 2014, at approximately 10:44 a.m., Fred BROOKS, utilizing BROOKS TELEPHONE #2, sent an outgoing text message to WILSON TELEPHONE #1. The content of the message was "Can you meet me in NOLA Thursday."

24.   Based on my training, knowledge and experience, I believe BROOKS is asking WILSON to meet with him in person in New Orleans, LA.

25.   On April 01, 2014, at approximately 12:57 p.m., Fred BROOKS, utilizing BROOKS TELEPHONE #2, received an incoming text message from WILSON TELEPHONE #1. The content of the message was "Wsupi cant leave until fri"

26.   Based on my training, knowledge and experience, I believe WILSON is informing BROOKS that he won't be able to travel until Friday, April 04, 2014.

27.   On April 01, 2014, at approximately 2:53 p.m., Fred BROOKS, utilizing BROOKS TELEPHONE #2, sent an outgoing text message to WILSON TELEPHONE #1. The content of the message was "I think I should fly to LA and rap to u"

28.     Based on my training, knowledge and experience, I believe BROOKS is telling WILSON that he wants to fly to Los Angeles, CA, to meet with WILSON in person. At this time, WILSON was about to move to California for approximately one month. See paragraph *** for information).

29.     On April 1, 2014, at approximately 2:46 p.m., agents intercepted an incoming call BROOKS TELEPHONE #2 from WILSON TELEPHONE #1. During the call BROOKS stated, "I see what's up [pause] what was I gonna tell you, shoot, oh, so, did dude come by and talk to you? Or he just gonna come by on Wednesday." WILSON responded "Oh, prob'ly tomorrow, I ain't heard from him." BROOKS stated "Okay, alright, that's what's up. Yeah so, what I'll probably do, I'm gonna try to see see if I can fly out, out that way or something maybe for a day or something." WILSON responded "I was gonna say, if you want- if you want- you can meet me in Vegas Friday." BROOKS stated "Oh, you'll be in Vegas Friday?" WILSON responded, "Yeah, I'm go fly there, and then drive up to there cause..." BROOKS stated, "Are you going to stay all weekend in Vegas or just..." WILSON responded, "No, I'm just goin'..yeah I'm gonna stay the night and just go Saturday cause, you know when you be going from here to there, they just you know they just be looking for shit." BROOKS stated, "Oh, okay." [laughs]. WILSON responded, "You know what I'm saying, every time everyone go from here to there them mother fucker be like, what you doing?" [laughs]. BROOKS stated, "Right. Why you going there? What you up to?" WILSON responded, "Yeah all that so, I just go there, stay there and then just drive up from there." BROOKS stated "That's what's up." WILSON responded "Yeah." BROOKS stated, "I don't know, if I can shoot out there on Friday, I will, but if not I'll just catch you sometime." WILSON responded,

"Dude, I'll be out there just tell me when you coming out there." BROOKS stated, "Yeah, I just stay like a day, I'll stay like a day and roll right back out." WILSON responded, "Alright, alright that is cool. everything cool though?" BROOKS stated, "Yeah, I just going to go grab [u/i] try, try to, do something a little different man, cause...Unintelligible (U/I)." WILSON responded, [laughs] "Like you say, you know, got to be smart." BROOKS stated, "Yeah, that's it, [U/I] [U/I] talk with him, put our heads together, you know? WILSON responded, "Yeah, that's cool, I mean, if you can make it in just come straight out there. I be out there man, I'm I think I'ma- like you said good to be out there for a second anyway." BROOKS stated, "Yeah." WILSON responded, "You know what I mean? Then when I come back, I can start my own films, you·know they gonna finance it, the white boys I telling you 'bout, they gonna finance it so, he was like, just go out there and come on back and we gonna start on the first film and do this and then we do that and..." BROOKS stated, "Right." WILSON responded, "So I'm like shit alright. Yeah. [pause] But I'ma, I'll shoot you a text and if he visits for tomorrow, he just come through tomorrow." BROOKS stated, "Okay."

30.    Based on my training, knowledge and experience is asking WILSON if he met up with WHEELER. WILSON tells BROOKS that he will probably meet with WHEELER "tomorrow," April 02, 2014, BROOKS continues on telling WILSON that he want to fly out to where WILSON is going. WILSON tells BROOKS that he will be in Las Vegas on Friday, April 04, 2014 and then he will drive from Las Vegas to Los Angeles. BROOKS tells WILSON that if he can't go to Las Vegas on "Friday" then he wants to fly out to Los Angeles because he wants to try something different. I believe BROOKS wants to change the methods he is using for his DTO. WILSON responded,

"Like you say, you know, got to be smart." I believe WILSON is agreeing with BROOKS about changing the methods they are using for their DTO so that they don't get caught by law enforcement. WILSON goes on to explain that he will be in Los Angeles learning how to make films. I believe WILSON is referring to his business S.A.W. Entertainment, which has been identified as a promotion company utilized to launder illicit funds. In the end of the conversation WILSON tells BROOKS that he will let BROOKS know if WHEELER comes to see him the next day (April 2, 2014).

31.    Investigators checked the toll records and learned that on April 2, 2014, WHEELER TELEPHONE #1 and WILSON TELEPHONE #1 exchanged eleven (11) text message/SMS communications. Beginning on April 2, 2014, DEA Baltimore began intercepting all wire (voice) communication over WHEELER TELEPHONE #1 but was not intercepting electronic (text) communications. I believe that these text message/SMS communications were in reference to WHEELER meeting with WILSON in order to obtain $76,880.00 on behalf of Fred BROOKS.

32.    On April 03, 2014, at approximately 11:30 a.m., members of DEA Group 52 established surveillance in the area of Unit Block West 25th Street, Baltimore, MD. At approximately 1:00 p.m., TFO Corey Landing observed a Black 2004 Jeep Grand Cherokee bearing Maryland tag 4AP2892, which investigators know is used by and registered to WILSON, park on the side of the street of the Unit Block West 25th Street. Shortly thereafter, TFO Landing observed WILSON exit the driver's side of this vehicle and walk to the sidewalk. TFO Landing observed WILSON talking on a cellphone. At that time, TFO Brian Shutt placed a phone call to WILSON TELEPHONE #1. Through surveillance, WILSON was observed looking at his phone contemporaneous to the phone

call being placed by TFO Shutt. WILSON ignored the incoming call and continued his original conversation. Surveillance was then terminated.

33.    On May 19, 2014, the Baltimore District Office (D.O.) Group 52, prepared and submitted a state Title-III affidavit to the Maryland State's Attorney's Office for Baltimore City to initiate a wiretap investigation on Sean WILSON. Associate Judge for the Circuit Court for Baltimore City Audrey J.S. Carrion approved the affidavit and issued a court order for the establishment of a state Title III intercept investigation on WILSON'S cellular telephone, 407-592-0138, (hereinafter WILSON TELEPHONE #2).

34.    On May 21, 2014 at approximately 7:28 p.m. Sean WILSON, utilizing WILSON TELEPHONE #2, made an outgoing call to telephone number 202-746-4336 (BROOKS TELEPHONE #4), utilized by BROOKS. During this conversation WILSON stated "I got, I got a couple more pennies, but, you know what I'm sayin? Just nothing to make no noise about, but it's, it's, it's about to be you know, close to a buck." BROOKS stated, "Oh ok." WILSON stated, "And uh, you know what I mean. But shit everybody already went so that's why I was like shit. You know, they, they trying to fast forward the system, we can't do that. We got to keep everything like it is, that way a nigga won't get out of line. They make too much money they gonna start doing dumb shit. BROOKS responds in the positive. WILSON stated, "You know, behind all this owe this, that, you got to keep these niggas; you gotta monitor these niggas." BROOKS stated, "You got to save them from themselves." I believe that during this part of the conversation WILSON is using coded language in providing BROOKS an update on how much money ("pennies") that he has accumulated in reference to the drug debt owed to BROOKS.

35.     Further into the conversation WILSON stated "Hey uh, I got uh, hey listen uh, the dude, I'm getting ready to pass the dude's number. My man he came the other day but I didn't have it with me. That was my fault. But, cause you know I don't be carrying all these at the same time. But, I'm trying to get to him now and give him the number, and tell dude he probably call him one time. Then he probably put him on the system where's he just have to text him cause, I, I don't want none of my guys talking. That way they don't talk. I know something, if they got a problem I know they created it themselves."

36.     I believe that during this part of the conversation WILSON is using coded language to tell BROOKS that he is going to pass a telephone number to a unknown individual. WILSON explains that he does not carry all of his numerous phones ("But, cause you know I don't be carrying all these at the same time.") WILSON also explains that he prefers to utilize text messaging when communicating in reference to drug trafficking ("Then he probably put him on the system where's he just have to text him cause, I, I don't want none of my guys talking.") BROOKS responded in the positive.

37.     WILSON continued, "You know what I'm saying? Cause they uh, uh, my cousin he supposedly got fifty seven months, but everyone else getting thirty, I mean uh, uh, yeah twenty to thirty years so...I don't know how the fuck that happened but." BROOKS stated "Holy shit." WILSON stated, "Yeah, I don't know, I'm still trying to get to the bottom of it. So, you know what I mean? But, about me being and gettin' to the bottom of it. To him, I still (inaudible), to him and a lot of people I'm still in school." BROOKS stated, "Right, oh so he went on and got his time already?" WILSON stated, "Well that's what I heard he 'bout, that was he supposed get ready to get." BROOKS

19

stated, "Oh ok. But everyone else got twenty years." WILSON stated, "Yeah I'm, you know what I'm saying, niggas like yooooo, what the fuck? I believe that at this point in the conversation between BROOKS and WILSON, WILSON is explaining to BROOKS the arrest of his cousin Andre HUNT, who was arrested after a search warrant revealed approximately two kilograms of heroin at his stash house. HUNT was charged in a conspiracy with other individuals in reference to the heroin distribution based in the Gilmor Homes section of Baltimore, Maryland. WILSON is explaining to BROOKS that he believes HUNT is cooperating with law enforcement, and he is trying to confirm.

38.   WILSON stated, Yeah so. So look, so dude, you want us to give him a dollar?" BROOKS responded, "Yeah just a dollar." WILSON stated, "Alright, and then he just gonna come back, on the back end?" BROOKS responded, "Yup, yup." WILSON stated, "Oh. Hey uh, uh, uh, uh, can we, can we get him for eighty?" BROOKS asked "Huh?" WILSON replied, "Can we do him on eighty?" BROOKS replied, "Yeah, the only thing is I got to give this dude down here, um, a nickel off of it, on this end. So, so it's really seventy five, but." WILSON stated, "Oh, ok." BROOKS stated, "But yeah you can tell him eighty. And then uh, I'll take care of him. I'll take care of the dude here, and just you know somehow we figure out how to uh, how to get the nickel to him." I believe that BROOKS is telling WILSON that the unknown individual tasked with transporting the money from WILSON in Baltimore, Maryland to BROOKS in Houston, Texas will be arriving soon. BROOKS instructs WILSON to give this individual $100,000.00 ("dollar"). WILSON asks BROOKS if he can provide only $80,000.00 ("...can we get him for eighty?"). BROOKS explains that it would really

only be $75,000.00 due to the fact that BROOKS has to pay the unknown person transporting the money $5,000.00 ("...a nickel").

39. WILSON then stated, "Alright, cause I, I'm just going to let my man. Cause I ain't, I don't want to see nobody. I don't give a shit who he is. I ain't seeing nobody." BROOKS stated, "Hey but you know uh, one of them, whatcha calls, uh, you know one of them, uh, for you though." WILSON replies, "Huh?" BROOKS stated, "You know one of them uh, whatcha call its, the uh, the auto parts, the two auto parts, you know one of them was, uh, for you though?" WILSON stated, "Oh, ok. Alright that's cool. I ain't, ain't, hey I'm still working on the other show. That's cool. And I got one that's put up for you." I believe that WILSON is explaining to BROOKS that he does not want to meet any other individuals. I believe that BROOKS is telling WILSON that during the upcoming transportation of drugs from BROOKS to individuals in Baltimore, Maryland that one kilogram is intended for WILSON ("...one of them uh, whatcha call it's, the uh, the auto parts, the two auto parts, you know one of them was, uh, for you though?"). WILSON explains to BROOKS that he is still selling the heroin from the previous shipment ("Oh, ok. Alright that's cool. I ain't, ain't, hey I'm still working on the other show.")

40. BROOKS then stated, "Ok. Yeah it's just one of them I got; I'm waiting on this dude to straighten me out. (Inaudible). Let me tell you I knew this nigga for like thirty years. I (inaudible). Just say you have people out there. I ask him, I said uh, uh, what, what um, you owe me? So, so I tell him but I was like, um, my diabetes had kicked in and my brain was moving slow. And I was like two bucks off, right? I just wasn't thinking, so I went back to my room, over the weekend, and this nigger was agreeing

with me and everything yeah, yeah. (Inaudible) I said fuck no. I said man, how in the, I ain't this mother fucking crazy. And uh, he's talking about oh I knew you was going to remember I was going to hold it for you when, when you finally remembered. I was just going to keep it for you until you remembered." WILSON stated, "Oh man." BROOKS stated, "(Inaudible) I said man your supposed to be my mother fuckin' man." WILSON replied, "That's crazy. That's crazy." BROOKS stated, "He gonna hold it for me." WILSON replied, "I bet he would. He going to hold it for you till he can figure out what he can do with it." BROOKS stated, "Hey but, just because of that, he gotta come all the way to the door. I told him, this is what I'm going to do. I'm going to hold that for you." I believe that during this part of the conversation BROOKS tells WILSON about another customer that owed an outstanding drug debt to BROOKS. BROOKS explains that while adding up the money he could not remember, due to his diabetes, what the exact outstanding debt was, and his final money counts were off by $200,000.00 ("two bucks"). BROOKS then explains that he figured it out and confronted the customer who advised BROOKS that he was just holding the extra money for him. BROOKS explained to WILSON that he told the customer that he is now holding the kilograms of heroin for the customer who will now have to travel to BROOKS to obtain the heroin instead BROOKS arranging for transportation.

41.    WILSON then stated, "Hey look, what uh, what uh, he uh, what um, oh, you, you, you ain't heard nothing on the situations?" BROOKS replied, "Yeah, it's, uh, I'm supposed to be hearing something the end of this week." WILSON replied, "Oh ok. Yeah but I; everybody just cooling man (inaudible)." BROOKS stated, "They tell me that whatcha call it. They tell me that that, that, that El Chapo, went uh, went down, went

all the way down to Colombia and bought everything and told them down there that they can't sell to no other Mexicans but him." WILSON stated, "God damn!" BROOKS stated, "The only ones that they could buy he bought the stock. And said they can only sell to him." WILSON asked, "He can do that?" BROOKS replied, "I guess if your money is long enough. He cornered the market." WILSON again stated, "God damn!" The conversation continued, WILSON stated, "Good, gogleymogley, that's mean. God!" BROOKS stated, "And you know he, he's doing that from a jail cell. He supposed to be locked (inaudible)." WILSON stated, "Damn." BROOKS stated, "He's calling shots like that, (unaudilbe)." WILSON stated, "That's, that's the to show his people that they gonna for sure get money." BROOKS replied, "Exactly." WILSON stated, "Yeah that's serious right there." BROOKS stated, "They not allowed to sell to no other Mexican, but them." WILSON asked, "But he's the strongest ain't he?" BROOKS stated, "Yeah he's the strongest, but everybody you know, all the different cliques, you know, spend their money down there." WILSON stated, "Shit they gonna have to just, they gonna have to just go to him." BROOKS replied, "He said I guess that's big bank takin' little bank." WILSON stated, "That's serious. That's serious right there." BROOKS stated, "He had to of come down there with at least ten to twenty billion, for them to do some shit like that." I believe that in this part of the conversation WILSON and BROOKS are discussing cocaine trafficking and that BROOKS begins to relay information concerning Joaquín Guzmán[1] ("El Chapo"). Guzmán's criminal organization, the Sinaloa drug cartel,

---

[1] Joaquín Guzmán a/k/a "El Chapo" has been identified as the leader of the Sinaloa Cartel, a criminal organization based in Mexico. Guzmán was arrested by Mexican authorities on February 22, 2014 and is awaiting trial on numerous federal narcotics trafficking charges both in Mexico and the United States.

is responsible for importing massive amounts of cocaine into the United States that originated in Colombia, I believe that BROOKS tells WILSON that Guzmán and or associates traveled to Colombia and met with producers of cocaine which is one of the largest producers of cocaine in the world. BROOKS explains that during this meeting, Guzmán and/or his associates purchased all of the available cocaine, and advised the producers of the cocaine that they can only deal with the Sinoloa cartel for future sales ("They tell me that whatcha call it. They tell me that that, that, that El Chapo, when uh, went down, went all the way down to Colombia and bought everything and told them down there that they can't sell to no other Mexicans but him."). WILSON stated "God damn. That crazy. That's insane."

42.   On May 22, 2014 at approximately 10:20 p.m. Sean WILSON, utilizing WILSON TELEPHONE #2, received an incoming text message from BROOKS TELEPHONE #4. The content of the message was, "Here is the number for Country for that 1 battery 252-550-0629".

43.   I believe that BROOKS sent WILSON this text containing the contact information for the individual ("Country") who is waiting to meet with WILSON in reference to picking up any monies owed to BROOKS and/or also delivering heroin on BROOKS' behalf. Through subsequent investigation, "Country" has been identified as James BRYANT, who was arrested on March 28, 2014, with approximately 2 kilograms of heroin after meeting with Timothy MCDERMOTT. (See ¶¶ 93-126, infra).

44.   On May 26, 2014, at approximately 2:04 p.m., Sean WILSON, utilizing WILSON TELEPHONE #2, received an incoming telephone call from BROOKS, utilizing BROOKS TELEPHONE #4. During this conversation WILSON stated, "Yo

probably gonna give your man a call later." BROOKS stated, "Oh ok." WILSON asked "What's up with the old dude?" BROOKS stated, "The old dude said he came into town and nobody responded back to him. And uh, he just gonna wait until somebody contact him again. But he, he know now it's a text only line." WILSON stated, "Yeah. If he came in town without being told to come to come in town, then ain't nobody gonna respond. He, he supposed to came the next morning, and my man waited and he ain't never respond. That's when I told you. So he might have...(Inaudible) When he's left waitin', you know what I mean. You see what I'm saying? They need to coordinate together." BROOKS responded, "Right. (Inaudible) he said he texted last night. He said he texted back last night." WILSON asked, "And did he uh, he (inaudible)." BROOKS responded, "He just waitin' for a response back." WILSON stated, "Oh, alright. I gonna be with him in probably about another hour, so I, you know what I mean." BROOKS stated, "Ok." A casual conversation continues. Further into the conversation BROOKS stated, "Hey uh, I think we want to come back through at the end of the week. Is that good for you or?" WILSON stated, "Uh, I mean the only thing I can pass him is what I got. You know that was a heavy, you know what I mean, you got to sit down and let the niggas work." BROOKS stated, "Yeah, yeah, yeah, alright. Well, cause I think, I think they had you on deck again. That's all." WILSON stated, "Oh yeah, no I ain't been doing, you know what I mean, like I told you I ain't been doing my thing. You know what I'm saying, but when they get finished, then we'll..." BROOKS stated, "Ok. I'll just tell them (inaudible). WILSON stated, "Yeah tell them chill cause I ain't even, I ain't even work on the auto part yet. I'm still dealing with the other, so. But I will send

you a text a little later on, I got, like a said, I got a couple, couple. But it should be a couple more by the end of the week, though." BROOKS stated, "Ok."

45.    I believe that during this conversation WILSON and BROOKS are discussing the details on why the transporter arrived in Baltimore, Maryland on BROOKS' behalf without being directed.   WILSON again details how he is utilizing a third party to communicate with the unknown individual ("...old dude") to avoid being identified.   BROOKS then asks if WILSON is ready to receive another shipment of heroin ("Hey uh, I think we want to come back through at the end of the week. Is that good for you or?"). WILSON explains that he is still trying to distribute the heroin from the last shipment due to the large amount ("Uh, I mean the only thing I can pass him is what I got. You know that was a heavy, you know what I mean, you got to sit down and let the niggas work.").    WILSON explains that he has some money collected, but believes he will have more money to pay off his outstanding debt by the end of the week.





48. Later on June 05, 2014, at approximately 12:59 p.m., Baltimore County Detective Ness #5182 arrived in the area of 3854 Twin Lakes Court Randallstown, Maryland 21133 (Target Location #2) and established surveillance. 3854 Twin Lakes Court is owned by Sonia and Sherry Wilson, believed to be WILSON's mother and sister, respectively. During this investigation, WILSON was observed entering and exiting on multiple occasions. Detective Ness observed a black 2004 Jeep Grand Cherokee (MD-40419CB) parked in front of 3854 Twin Lakes Court. A records check through the Maryland Motor Vehicle Administration revealed that this vehicle is registered to Sonia Wilson at 8283 Streamwood Drive, Pikesville, Maryland 21208.

49. At approximately the same time, Baltimore County Detective Rickabaugh #4008 established surveillance in the area of 8809 Falcon Ridge Drive Randallstown, Maryland 21133 (Target Location #1). 8809 Falcon Ridge Drive is owned by Sonia Wilson, believed to be WILSON's mother, and is WILSON's primary residence. Detective Rickabaugh observed a black 2012 Jeep Grand Cherokee (MD- 4AP2892) parked in front of 8809 Falcon Ridge Drive. A records check through the Maryland Motor Vehicle Administration revealed that this vehicle is registered to Sean WILSON at 8283 Streamwood Drive, Pikesville, Maryland 21208.

50. At approximately 1:49 p.m., Detective Rickabaugh observed Sean WILSON exit 8809 Falcon Ridge Drive and enter the driver's seat of his 2012 Jeep Grand Cherokee (MD- 4AP2892). WILSON then drove away from the area.

51. At approximately 1:55 p.m., Detective Ness observed WILSON park in front of 3854 Twin Lakes Court. WILSON exited his vehicle wearing a gray tee shirt, gray pants and carrying a track jacket. The track jacket was being carried in his left hand swinging freely. Detective Ness observed WILSON utilize a key to enter the front door of 3854 Twin Lakes Court.

52. At approximately 2:01 p.m., Detective Ness observed WILSON exit the front door of 3854 Twin Lakes Court with the track jacket folded around an unknown object(s) and hugged to his chest. WILSON was walking quickly to his black 2002 Jeep Grand Cherokee (MD- 40419CB). WILSON entered the driver's seat of his 2002 black Jeep Grand Cherokee (MD- 40419CB) and immediately leaned down towards the floorboard of the vehicle. WILSON drove out of the area and was surveilled by Detectives Ness and Rickabaugh.

53. At approximately 2:17 p.m., WILSON arrived and parked on Pellinore Court Pikesville, Maryland 21208. Due to the area and WILSON'S previous counter surveillance actions, Detectives were unable to observe WILSON exit his vehicle and enter a residence on Pellinore Court. Detective Ness was able to park in the area to conduct stationary surveillance. At approximately 2:32 p.m., WILSON and an unknown black male exit an unknown location on Pellinore Court from between buildings 13 and 14 they shake hands and WILSON entered his vehicle and the unknown black male entered a black 2002 Lexus four door (MD- 40793CC). Both vehicles drove away from the area.

29

56. At that time, SA Michelle Zamudio began to monitor electronic communication via GPS tracking (cell tower), which placed WILSON in the vicinity of his residence located at 8809 Falcon Ridge Drive, Randallstown, Maryland.   At approximately 11:00 a.m., investigators initiated stationary surveillance on 8809 Falcon Ridge Drive and 3854 Twin Lakes Court.

57. Upon arriving at 8809 Falcon Ridge Drive, SA Michelle Zamudio observed WILSON'S 2012 black colored Jeep Cherokee bearing Maryland registration 4AP2892, parked in front of the residence.   At approximately 12:38 p.m., SA Zamudio noticed the GPS tracking of WILSON'S cellular phone placed WILSON in White Marsh,

Maryland. At approximately 1:52 p.m., SA Zamudio noticed the GPS tracking of

WILSON'S cellular phone placed WILSON back in the area near 8809 Falcon Ridge

Drive. SA Zamudio then observed a white 2010 Cana three wheel motorcycle bearing

Maryland Tag D58657 parked in the driveway of the residence. (NOTE: This vehicle was

not at the location when surveillance was initially established). A records check through

the Maryland Motor Vehicle Administration revealed that this vehicle is registered to

Sean WILSON at 8283 Streamwood Drive, Pikesville, Maryland 21208.

58.     At approximately 2:30 p.m., SA Zamudio observed a medium skin black

male subject with a short afro hairstyle, exit the front door of 8809 Falcon Ridge

Drive. SA Zamudio observed the black male subject walk to the white 2010 Cana three

wheel motorcycle bearing Maryland Tag D58657. The black male subject popped the

hood of the motorbike, checked the engine and immediately closed the hood of the

motorbike. He then placed a motorbike helmet on his head, looked in the direction of

SA Zamudio's covert vehicle, and immediately departed the residence.

59.     At approximately 3:21 p.m., SA Zamudio noticed the GPS tracking of

WILSON'S cellular phone placed WILSON in Pikesville, Maryland near the Court of

Avalon Apartment Homes. Shortly thereafter, TFO Brian Shutt responded to the 900

block of Iron Horse Lane an attempt to locate WILSON. Upon arrival, TFO Shutt began

to canvass several apartments within the Courts of Avalon Apartment Homes and noticed

several roads within the courtyards being resurfaced by a private paving company. Based

on previous intercepted communication, investigators know that WILSON recently

informed BROOKS, that he couldn't get inside the garage at his stash location

because they are repaving the street near the garage and they can't get inside the garage to

31

unload anything. TFO Shutt responded inside the leasing office of the aforementioned apartment homes and spoke with the representatives of the management company. At that time, representatives of the apartment homes provided TFO Shutt with a map of the entire complex with the exact days designated for road resurfacing within the complex. Minutes later, TFO Shutt canvassed the area in an attempt to locate WILSON. TFO Shutt observed the white 2010 Cana three wheel motorcycle bearing Maryland Tag D58657 parked on the sidewalk path adjacent to the Pellinore Court apartment homes complex. At that time, TFO Shutt initiated surveillance of several apartment homes within the courtyard of Pellinore Court. At approximately 4:05 p.m., TFO Shutt observed a black male subject matching the same description of the black male subject riding the white 2010 Cana three wheel motorcycle bearing Maryalnd Tag D58657, exit the courtyard of Pellinore Court Building 13 or 14. The black male subject exited the rear of the courtyard (wooded area) and walk towards his motorbike parked on the sidewalk in the 900 block of Iron Horse Lane. Seconds later, TFO Shutt observed the black male position himself on the motorbike and depart the area eastbound on Iron Horse Lane. Based on the physical description of the black male subject, TFO Shutt believed the black male subject was Sean WILSON, wearing a wig disguise to prevent law enforcement authorities from detecting his true identity. At approximately 4:15 p.m., surveillance was terminated.

60.    Based on the foregoing, and additional information contained later in this affidavit, I respectfully submit that probable cause exists to believe that Sean WILSON is engaged in a conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin. I further submit that probable cause exists to believe that the SUBJECT

32

PREMISES and vehicles described above may contain evidence relating to WILSON'S illegal drug activities including, narcotics paraphernalia, documents, and/or cellular phones.

### SUBJECT PREMISES #3 and Vehicle

Location:             911 Pirates Court Edgewood, MD 21040

Target Subject(s):    Phillip WHEELER FBI# 404127JB9

                      Timothy MCDERMOTT FBI # 118829PA8

Vehicle(s): 2009 Honda Accord Maryland Tag A241700 VIN# 1HGCS12829A008027

61.   On March 11 and 12, 2014, a number of calls and text messages were intercepted between MCDERMOTT, utilizing MCDERMOTT TELEPHONE #1, 304-279-3468 and various TARGET SUBJECTS.  The below communications, combined with visual surveillance conducted by agents and the GPS tracking data from MCDERMOTT TELEPHONE #1, leads agents to believe, based upon their knowledge, training, and experience, that MCDERMOTT traveled to Chicago, Illinois to pick up 3 kilograms of heroin from associates of a Mexican source of supply (identified herein as UM1 and UM2).  MCDERMOTT then traveled to Youngstown, Ohio to meet with Jason PAYNE to deliver an unknown portion of the heroin obtained in Chicago before returning to West Virginia with the remaining heroin.

62.   On March 11, 2014, at approximately 5:13 p.m., Timothy MCDERMOTT, utilizing MCDERMOTT TELEPHONE #1, received an incoming phone call from telephone number (210) 776-5814, utilized by BROOKS.  During the phone call BROOKS told MCDERMOTT, "Hello."  MCDERMOTT responded, "Hey, hey what's up dude."  BROOKS said, "Hey my batteries dead so if you need me just give me a call

33

on this number." MCDERMOTT responded, "You said alright call call it call this." BROOKS said, "Yea I said if you need me just call me on here. My battery on the other one is dead." MCDERMOTT replied, "Oh ok ok yeah." BROOKS said, "Ok." MCDERMOTT responded, "Dude dude uh is supposed to be texting me in a few minutes. I don't know uh they said its rush hour. I ain't even made it back to the what you call it. Hopefully he will text me cause if not man I'm bouncing." BROOKS said, "Oh, ok, they called you back?" MCDERMOTT responded, "Not not not the guys uh that uh up here. The other guy. He's uh I guess he's trying to figure out what's going on but he told me to hold tight for a few minutes and uh..." BROOKS said, "Huh?" MCDERMOTT responded, "You know what I'm talk the dude uh uh he he he told me to uh he told me to hang tight for a few minutes. I guess he's trying to figure out what's going on. But uh like I said I'm headed back to grab a couple of my things and he got until then." BROOKS said, "Yeah try to catch him another day or something." MCDERMOTT responded, "Yeah I mean I uh I mean if he was sure about it you know I mean I'll hang out for a few but well alright I'll give you a holla if I hear anything." BROOKS said, "Ok."

63.      Agents believe, based on their knowledge, training, and experience that during the above call BROOKS called MCDERMOTT to inform him that his other cell phone had a dead battery which was turned off at the moment and to call him on the number he just called him on. This indicates that BROOKS is utilizing multiple cell phones. It is common for drug traffickers to utilize multiple phones in order to avoid detection from law enforcement. Agents believe that MCDERMOTT was telling BROOKS that he was waiting to hear from an unknown male in order to pick up money

or an unknown amount of heroin.  MCDERMOTT tells BROOKS that if he doesn't hear from this UM then he is going to leave Chicago.  Agents know that MCDERMOTT was sending and receiving text messages from Mexican number 52-722-554-4885, utilized by UM1, but due to technical issues these text messages were not recorded.  Agents believe that this Mexican number was the source of supply from whom MCDERMOTT was waiting to hear.

64.     On March 11, 2014, at approximately 6:31 p.m., Timothy MCDERMOTT, utilizing MCDERMOTT TELEPHONE #1, received an incoming phone call from telephone number (630) 926-1580, utilized by UM2.     During the phone call MCDERMOTT said, "Hello."  UM2 responded, "Hey."  MCDERMOTT said, "What's up man?"  UM2 responded, "Yeah, we're gonna go your way just give me about an hour. That's how far away I am from you."  MCDERMOTT said, "Alright alright."  UM2 responded, "That's cool?"  MCDERMOTT said, "I'll hang out then. Yeah it ain't no problem."  UM2 responded, "Alright yeah we're gonna make it to your way.  Wait for us."  MCDERMOTT said, "Alright yeah yeah, if you're gonna be an hour yeah I'll hang out and uh."     UM2 responded, "Ok, alright 'Dave' I'll see you then cuz." MCDERMOTT said "Ok man."  UM2 responded, "Alright. You know you know what's going on already right?"  MCDERMOTT said, "Yeah yeah."  UM2 responded, "With the three dollars."  MCDERMOTT said, "Right right right."  UM2 responded, "Ok ok I just wanna know we're on the same page.  Ok thanks.  I'll see you."  MCDERMOTT said, "Hey, you talking about you're gonna bring me three dollars right?"  UM2 responded, "Yeah."     MCDERMOTT said, "The three dollars?"     UM2 responded, "yeah." MCDERMOTT said, "Yeah ok alright. I just wanted to make sure."  UM2 is inaudible.

MCDERMOTT said "Huh?" UM2 responded, "So uh, you're gonna take them with you right?" MCERMOTT said, "Yeah yeah yeah." UM2 responded, "Ok." MCDERMOTT said, "Alright man I'm waiting on you then." UM2 responded, "Ok um, ok you said uh Midway. Alright um." MCDERMOTT responds, "Yeah I'm right um right at um 55 and Cicero." UM2 responded, "Ok, what's there?" MCDERMOTT said "It's uh it's uh a little motel called Skylark." UM2 responded "Ok alright. Actually I know what you're talking about." MCDERMOTT said, "Ok I'll see you then cuz." UM2 responded, "Thank you." MCDERMOTT said, "Alright man." UM2 responded "Ok."

65.     Agents believe, based on their knowledge, training, and experience that UM2 informed MCDERMOTT that he will be supplying MCDERMOTT with "three dollars," which agents believe to be coded language for three (3) kilograms of heroin. MCDERMOTT agreed to take custody of the "three dollars" from UM2 and informed UM2 of his location at the Skylark Motel on South Cicero Avenue, Chicago, Illinois.

66.     On March 11, 2014, at approximately 7:52 p.m., Timothy MCDERMOTT, utilizing MCDERMOTT TELPHONE #1, received an incoming text message from telephone number 52-722-554-4885 (telephone number based in Mexico), being utilized UM1. The content of the message was "Let me know when you geter ok."

67.     Agents believe, based on their knowledge, training, and experience, that UM1 was telling MCDERMOTT to let him know when he gets the three kilograms of heroin. Agents believe that UM1 is the source of supply and was coordinating the meet between UM2 and MCDERMOTT.

68.     On March 11, 2014, at approximately 8:15 p.m. Timothy MCDERMOTT, utilizing TARGET TELPHONE #1, received an incoming text message from telephone

number (832) 302-3861, being utilized by Jason PAYNE. The content of the message was: "U sure midnight." Seconds later, MCDERMOTT received another incoming text message from telephone number 832-302-3861, being utilized by PAYNE. The content of the message was: "If so let me know when an hour away."

69.     Agents believe, based on their knowledge, training, and experience, that PAYNE was telling MCDERMOTT to let him know if he is sure that he will be arriving in Youngstown, Ohio around midnight and if so to let him know when he was an hour away. Agents believe MCDERMOTT traveled to PAYNE's residence to supply PAYNE with a quantity of illegal narcotics obtained from the Mexican source of supply in Chicago, Illinois.

70.     On March 11, 2014, at approximately 10:25 p.m., Timothy MCDERMOTT, utilizing MCDERMOTT TELPHONE #1, received an incoming text message from Mexican telephone number 52-722-554-4885 being utilized by UM1. The content of the message was: "You gatre guero."

71.     Agents believe, based on their knowledge, training, and experience that UM1 was asking MCDERMOTT if he got the three kilograms of heroin.

72.     On March 11, 2014, at approximately 10:26 p.m., Timothy MCDERMOTT, utilizing MCDERMOTT TELPHONE #1, sent an outgoing text message to Mexican telephone number 52-722-554-4885, being utilized by UM1. The content of the message was: "Yes."

73.     Agents believe, based on their knowledge, training, and experience, that MCDERMOTT was informing UM1 that he did obtain the three kilograms of heroin, as indicated in the text reply stating "Yes."

74.   On March 13, 2014, at approximately 10:36 a.m., Timothy MCDERMOTT, utilizing MCDERMOTT TELEPHONE #1, made an outgoing call to telephone number 410-322-1655 (WHEELER TELEPHONE #2), utilized by PHILIP WHEELER.  During this conversation MCDERMOTT stated, "He wanted me to um, to um, to bring some paperwork um, down, uh."   WHEELER stated, "Right." MCDERMOTT stated, "Are you home now or at work?"  WHEELER replied, "I'm home."   MCDERMOTT stated, "Oh your home?"   WHEELER stated, "Yeah." WHEELER stated, "Oh, ok.  You think you're going to be there later this afternoon?" WHEELER stated, "Yeah, but I thought he was saying that you would do it this weekend unless I got everything together."   MCDERMOTT stated, "Oh, oh ok. Um, this weekend?"  WHEELER stated, "Yeah like probably, um, either tomorrow or Saturday. But it probably be Saturday.  And then you can just get it all, get it all at the same, at one time."  MCDERMOTT stated, "Oh ok, alright, I didn't know it wasn't no hurry. Uh, um, um, it's a possibility this evening, though um, I'll, I'll, um, I'll bring down what I have left, paperwork (inaudible)."  WHEELER replied, "Ok."  MCDERMOTT stated, "I'll give you a call a little bit later ok?"  WHEELER replied, "Alright then."

75.   I believe, based on my knowledge, training, and experience that during this conversation MCDERMOTT was telling WHEELER that he was going to travel to his location to drop off an amount of drugs ("paperwork").  WHEELER stated that he believed after speaking with BROOKS ("Yeah, but I thought he was saying...") that MCDERMOTT would bring the drugs ("paperwork") this weekend "unless I got everything (money) together."   MCDERMOTT told him that he would be at this WHEELER's location later that evening to drop off the paperwork.  I believe that

MCDERMOTT was going to travel that evening to Baltimore, Maryland, to drop off an unknown amount of drugs to WHEELER.

76.     On March 13, 2014, at 6:19 p.m. Timothy MCDERMOTT, utilizing MCDERMOTT TELPHONE #1, made an outgoing call to telephone number WHEELER TELEPHONE #2.   During this conversation MCDERMOTT stated, "Yeah Phil?" WHEELER replied, "Hey." MCDERMOTT stated, "Hey I uh, was going to see if it's ok if I swung by there around seven thirty man?"   WHEELER replied, "Um...." MCDERMOTT asked, "Or is that a bad time?" WHEELER stated, "Yeah that's a bad. Cause I got something to do this evening. But um...." MCDERMOTT stated, "Oh shit ok, um, what about uh, in the morning or anything?" WHEELER replied, "OK. Have you talked to him?" MCDERMOTT stated, "Uh, just uh, uh, early this morning." WHEELER stated, "Ok." MCDERMOTT replied, "Alright, so you just want me to uh, just want me to stop down tomorrow, during the day?" WHEELER replied, "Ok."

77.     I believe, based on my knowledge, training, and experience, that during this call MCDERMOTT was attempting to schedule a time to meet with WHEELER (who he identifies during the call by WHEELER's first name of "Phil") to complete the anticipated drug transaction. During the call WHEELER asked if MCDERMOTT spoke to "him." I believe that WHEELER was trying to ask MCDERMOTT if he has spoken or gotten direction from BROOKS, without directly saying BROOKS' name over the phone.

78.     On March 14, 2014, at 11:35 a.m. Timothy MCDERMOTT, utilizing MCDERMOTT TELEPHONE #1, made an outgoing call to telephone number 210-322-1655, a phone being utilized by Phillip WHEELER.   During this conversation

39

MCDERMOTT tells WHEELER that he is on his way to WHEELER's location and that he should arrive "between one and one thirty...."

79.    At this time, surveillance was established at 911 Pirates Court, Edgewood, Maryland 21040. At approximately 1:20 p.m., Special Agent (SA) Zamudio observed a silver/bronze Cadillac Escalade bearing a West Virginia registration arrive in front of the location. At this time, SA Zamudio observed MCDERMOTT exit the driver's side and walk to the rear of the vehicle from which MCDERMOTT removed a box. MCDERMOTT then walked to the front door of the residence, and after approximately three minutes, made contact with a black male (believed to be Philip WHEELER). Both individuals then entered the residence. At approximately 1:24 p.m., SA Zamudio observed MCDERMOTT exit the residence without the box. MCDERMOTT then entered his vehicle and left the area. Surveillance continued on 911 Pirates Court. At approximately 3:06 p.m., a black male, later identified as WHEELER, was observed exiting the residence and entering into a black Honda Accord bearing Maryland registration A241700. A check through Maryland Motor Vehicle Administration records revealed that this vehicle is registered to Phillip WHEELER at 911 Pirates Court, Edgewood, Maryland 21040. WHEELER entered the vehicle and began traveling towards Interstate 95. WHEELER was observed by law enforcement entering onto Interstate 95 heading south. While traveling on Interstate 95, Task Force Officer (TFO) Brian Shutt drove next to WHEELER's vehicle and positively identified the male operating the vehicle as Phillip WHEELER through a photograph obtained through Maryland Motor Vehicle Administration records.

80.     WHEELER continued on Interstate 95 southbound until taking the exit for Interstate 295 southbound.   Surveillance continued to follow WHEELER as he immediately exited southbound Interstate 295 at the Annapolis Road exit.  WHEELER was then followed as he traveled north onto Monroe Street.  WHEELER was then observed to begin changing his vehicle speed dramatically and was observed to make a left from Monroe Street onto Eagle Street.  At this time WHEELER was observed stopping and starting again, then making a quick U-turn in the middle of the street.  TFO Shutt believed, based on his training, knowledge, and experience as a CDS investigator, that WHEELER was employing counter surveillance techniques in an attempt to "clean" himself from possible law enforcement surveillance.  At this time surveillance was terminated.

81.     Agents believe, based on their knowledge, training, and experience that MCDERMOTT traveled to 911 Pirates Court, Edgewood, Maryland to drop off drugs to WHEELER, which MCDERMOTT had obtained while in Chicago, Illinois.  Agents also believe that WHEELER utilized his 2009 Honda Accord bearing Maryland registration A241700 to transport an amount of drugs to Baltimore, Maryland.

82.     On March 27, 2014, at approximately 3:55 p.m., MCDERMOTT utilizing MCDERMOTT TELEPHONE #2 made an outgoing call Phillip WHEELER utilizing WHEELER TELEPHONE #1. During the call WHEELER stated, "....(unintelligible)." MCDERMOTT responded, "Hello." WHEELER stated, "Hello." MCDERMOTT responded, "Hey, hey, (unintelligible), hey um." WHEELER stated, "What's up?" MCDERMOTT responded, "Hey uh, listen the guys here said that, that was uh 144, did uh, it wasn't nothing left behind was it?" WHEELER stated, "Yeah but.......144?"

41

MCDERMOTT responded, "Yeah, he said, that's why I was like man, what the fuck!" WHEELER stated, "Um, (unintelligible), originally it was supposed to be 300, and then he told me to keep 50, so that's supposed to be 250." MCDERMOTT responded, "Did um, did did you go through it? Yourself?" WHEELER stated, "No I didn't." MCDERMOTT responded, "No?" WHEELER stated, "No I didn't. It sounded like it must've just have been 200, not 300." MCDERMOTT responded, "Right, right, right, ok alright." WHEELER stated, "I got to call someone, I'll call you right back." MCDERMOTT responded, "Ok alright." WHEELER stated, "Ok."

83.    Based on my knowledge, training and experience I believe MCDERMOTT was informed of a discrepancy in the money from the previous week's drug proceeds that was given to UM6. I believe MCDERMOTT calls WHEELER to ask him about this discrepancy. I believe that WHEELER picked up money that was received from drug proceeds from various individuals in the Baltimore, MD area and gave the money to MCDERMOTT in order for MCDERMOTT to transport the money to Chicago for the Mexican heroin source of supply. I believe WHEELER thought that he counted $300,000, was told to keep $50,000, and the remaining $250,000 would go the Mexican heroin source of supply in Chicago. MCDERMOTT asks WHEELER if he counted the money and WHEELER responded no. I believe that WHEELER realizes that he made a mistake and tells MCDERMOTT that the amount of money might have been $200,000 not $300,000. WHEELER then tells MCDERMOTT that he has to call somebody. I believe WHEELER is telling MCDERMOTT that he as to call BROOKS.

84.    On March 27, 2014, at approximately 4:12 p.m., MCDERMOTT utilizing MCDERMOTT TELEPHONE #2 received an incoming call from UM1, 011-

527225544885. During the call MCDERMOTT stated, "Hello." UM1 responded, "What's up." MCDERMOTT stated, "Hello." UM1 responded, "Yeah, what's up man?" MCDERMOTT stated "Hey what's going on?" UM1 responded, "Not much, hey how much paper you give to my boy." MCDERMOTT stated, "It was supposed to be 250, but he's saying it was 144, I'm calling a friend right now to tell him, to find out what's going on." UM1 responded, "...(unintelligible)." MCDERMOTT stated, "Uh?" UM1 responded, "Check it out." MCDERMOTT stated, "Yeah, I trying to find out what's going on right now." UM1 responded, "Yeah because it's...that one is 144." MCDERMOTT stated, "That's what?" UM1 responded, "That's only 144." The call ended.

85.    Based on my knowledge, training and experience I believe that during this call UM1 is asking MCDERMOTT how much money he gave to UM6. MCDERMOTT explains to UM1 that UM6 is saying that the money added up to $144,000 but it's supposed to be $250,000. I believe that MCDERMOTT is telling UM1 that he is calling his "friend" (WHEELER) to find out what's going on.

86.    On March 27, 2014, at approximately 5:31p.m., MCDERMOTT utilizing MCDERMOTT TELEPHONE #2 received an incoming text from UM1, 011-527225544885. The content of the message was, "Guero are you not caunty the peipor or whats up?"

87.    On March 27, 2014, at approximately 5:37 p.m., MCDERMOTT utilizing MCDERMOTT TELEPHONE #2 sent an outgoing text to UM1, 011-527225544885. The content of the message was, "The guy I got the paper from fucked it up! Now I got to go get it and bring it here, but I don't count it, the guy I get it from told me it was 250."

43

88.     On March 27, 2014, at approximately 6:15 p.m., MCDERMOTT utilizing MCDERMOTT TELEPHONE #2 received an incoming text from UM1, 011-527225544885. The content of the message was, "Thas fack tha is 144."

89.     Based on my knowledge, training and experience I believe that during these series of text messages. UM1 is asking MCDERMOTT is he is counting the money. MCDEMROTT responds saying "The guy I got the paper from fucked it up!  Now I got to go get it and bring it here, but I don't count it, the guy I get it from told me it was 250." I believe MCDERMOTT is referring to WHEELER getting the amount of money wrong. MCDERMOTT tells UM1 that he has to go get the rest of the money from WHEELER and bring it back to Chicago. MCDERMOTT explains to UM1 that he doesn't count the money and the "guy" (WHEELER) who gave him the money said it should be $250,000. UM1 responds back to MCDERMOTT saying "Thas fack tha is 144. " I believe that UM is trying to say that the amount of money he received from MCDERMOTT is $144.000.

90.     On March 28, 2014, Task Force Officer (TFO) Brian Shutt prepared and submitted, and received a delayed notice ("Sneak and Peek") search and seizure warrant for ExtraSpace storage unit (unit 2198), located 410 Constant Friendship Blvd, Abingdon, MD. Storage Unit 2198 is leased by Phillip WHEELER

91.     On April 10, 2014, TFO Brian T. Shutt, SA Michelle Zamudio, SA Al Perry, TelCon Specialist Bruce Hill, and SA Randy Ballman made surreptitious entry into storage unit 2198.  Upon making entry, an orderly search was conducted and SA Zamudio recorded and photographed while TFO Shutt searched the unit.  During the search, the following items were located: (1) One aluminum shipping container with a torn off sticker that appears to be from "Forward Air"; (2) One receipt through

Enterprise Leasing Company of Baltimore in the name of "Phillip WHEELER" with hand written large amounts of currency totaled up (tally sheet) at the bottom of the sheet of paper. On the other side of the paper, hand written was "$63,320" next to the name "Pooh" and the name "Jimbo"; (3) Plastic bags containing a large amount of bulk currency; (4) Another plastic bag containing a cardboard box containing a large amount of bulk U.S. currency, and several bundles of loose bulk U.S. currency; (5) One box containing an electric currency counter; and (6) One "Lowes" receipt. After the search was complete, the Agents secured all items (described above) in the Storage Unit 2198 and re-locked the Storage Unit 2198. Note: All items were photographed and recorded then returned to their original location inside the unit. These photographs were then transferred to a CD (Exhibit N-2) and placed into DEA Evidence.

92.    Based on the foregoing, and additional information contained later in this affidavit, I respectfully submit that probable cause exists to believe that Timothy MCDERMOTT and Philip WHEELER are engaged in a conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin. I further submit that probable cause exists to believe that the SUBJECT PREMISES and vehicles described above may contain evidence relating to WHEELER'S illegal drug activities including, illegal weapons, documents, and/or cellular phones.

45

## SUBJECT PREMISES #4 and #5 and Vehicles

Location:   128 N. Hilton Street Baltimore, MD 21229
      3905 Shannon Drive Baltimore, MD

Target Subject(s): James BRYANT JR.; Timothy MCDERMOTT FBI # 118829PA8

Vehicle(s): 2000 Chevy Silverado Maryland Tag 34X809 VIN# 1GCGK29U3YE429433

White Freightliner Tractor Trailer U.S.D.O.T. # 191915

93. Based on court ordered location data I know that on March 26, 2014 and March 27, 2014, TARGET TELEPHONE #1 was in the area of Chicago, Illinois.  I further know that this was MCDERMOTT'S third trip to Chicago since March 11, 2014.

94. On March 26, 2014, at approximately 6:26 p.m., MCDERMOTT, utilizing MCDERMOTT TELPHONE #2, received an incoming text message from Mexican telephone number 52-722-554-4885, being utilized by UM1.  The content of the message was: "Ok coll to this number 786 2969608 his name is tony ok be carfuly ok."

95. I believe based on my knowledge, training, and experience, that UM1 was telling MCDERMOTT to call "Tony" at 786-296-9608 in order for "Tony" to supply MCDERMOTT with an unknown amount of drugs. I believe that MCDERMOTT utilized a different cell phone to call "Tony," because there were no intercepted with MCDERMOTT TARGET #2 and 786-296-9608.

96. On March 27, 2014, at approximately 1:13 p.m., Timothy MCDERMOTT, utilizing MCDERMOTT TELPHONE #2, received an incoming text message from

Mexican telephone number 52-722-554-4885, being utilized by UM1. The content of the message was: "Sanbaty collyou in next 10 minutes ok guaro."

97.   I believe based on my knowledge, training, and experience, that UM1 was telling MCDERMOTT that the person that he is going to meet with to pick up the unknown amount of drugs from was going to call him in ten minutes.

98.   On March 27, 2014, at approximately 2:21 p.m., MCDERMOTT, utilizing MCDERMOTT TELPHONE #2, received an incoming call from cell phone number (773) 817-4484 being utilized by an unknown male. During the call MCDERMOTT stated "Hello." The unknown male (UM) responded "Ya it's bub." MCDERMOTT stated "Hey ya, what's up man." The UM responded "Ya nobody told you to come pickup something?" MCDERMOTT stated "Ya but nobody called me." UM responded "Ok already in that same place." MCDERMOTT stated "That same place by the alley?" The UM responded "Yep at what time?" MCDERMOTT stated "I can be there in 30 minutes." The UM responded, "Ok I wait for you there." MCDERMOTT stated "Ok man." The UM responded "Ok bye."

99.   I believe based on my knowledge, training, and experience, that the UM was asking MCDERMOTT if somebody called him about picking up the drugs. MCDERMOTT informs the UM that nobody has called him yet. I believe that the UM then tells MCDERMOTT to meet him in an alley. I believe this is an alley where MCDERMOTT has picked up drugs from before and location that both MCDERMOTT and the UM are familiar with.

100.   On March 27, 2014, at approximately 3:21 p.m., MCDERMOTT, utilizing MCDERMOTT TELEPHONE #2, received an incoming text message from telephone

number 52-722-554-4885, being utilized by UM1. The content of the message was, "you gater guero."

101.   I believe, based on my knowledge, training, and experience that in this text message, UM1 is asking MCDERMOTT if he got the drugs he came to Chicago for.

102.   On March 27, 2014, at approximately 3:22 p.m., MCDERMOTT, utilizing MCDERMOTT TELEPHONE #2, sent an outgoing text message to telephone number 52-722-554-4885, being utilized by UM1. The content of the message was, "Yes he gave me two."

103.   I believe, based on my knowledge, training, and experience that in this text message, MCDERMOTT is informing UM1 that an unknown male utilizing telephone number 786-296-9608 or 773-817-4484  gave MCDERMOTT two kilograms of heroin.

104.   On March 27, 2014, at approximately 11:04 p.m., MCDERMOTT, utilizing MCDERMOTT TELEPHONE #2, received an incoming call from telephone number 443-867-7279, utilized by James Wilbur BRYANT JR. During the conversation MCDERMOTT stated, "Hello." BRYANT responded, "Hey dawg." MCDERMOTT stated, "Hey what's up man?" BRYANT responded, "Ain't nothing, long time no hear." MCDERMOTT stated, "Yeah man, no shit man, how you been?" BRYANT responded, "Alright, how you been man?" MCDERMOTT stated, "I'm doing alright man." BRYANT responded, "Hanging in there." MCDERMOTT stated, "Yeah man, got this long ass drive." BRYANT responded, "Yeah ah, he told me he want me to ah, us to get together." MCDERMOTT stated, "Yeah." BRYANT responded, "Okay, where you want me to come." MCDERMOTT stated "Um shit, I won't be home probably til tomorrow,

uh tomorrow morning sometime, I'll...you going to be free around then?" BRYANT responded, "Call me once you get in, let me know once you get situated, and just text me the info. Just text me the town, and I'll get there the best way I can. I give you a kind of ETA." MCDERMOTT stated, "Okay man, sounds good." BRYANT responded, "Yeah, what I'll do once you get in, cause I know your going to be tired, get yourself together, and once you text me the town. I'll get myself together then once I get ready. I'll ETA, a time to expect me." MCDERMOTT stated, "Okay man, sounds good dude." BRYANT responded, "Okay brother." MCDERMOTT stated, "Alright, this the number I can reach you at right?" BRYANT responded, "Yeah, yeah you can reach me on this 24/7." MCDERMOTT stated, "Alright then, I'll give you a holler tomorrow then." BRYANT responded, "Alright baby." MCDERMOTT stated "Okay man." BRYANT "See ya."

105.   I believe, based on my knowledge, training, and experience that in this call MCDERMOTT is informing BRYANT that he is on his way back to West Virginia from Chicago. BRYANT tells MCDERMOTT that "he" told me "he want me to ah, us to get together." I believe BRYANT is referring to BROOKS was telling him to meet with MCDERMOTT. I believe BRYANT is asking to meet with MCDERMOTT so that he can pick up the drugs MCDERMOTT is bringing back from Chicago. MCDERMOTT informs BRYANT that he won't be back in town until the following day. BRYANT asks MCDERMOTT to let him know what town and what time to meet with him so he can pick up the drugs.

106.   Investigators  know  through  court  ordered  location  data  that, MCDERMOTT was on his way back to West Virginia after traveling to Chicago. On March 28, 2014, at approximately 8:00 a.m., SA Dellamura and members of the Jefferson

County Sheriff's Department established surveillance in the area of 269 Shagbark Lane, Harpers Ferry, West Virginia 25425 and 103 Elm Street Shenandoah Junction, WV, in order to observe Timothy MCDERMOTT arrive to one of these locations after traveling to Chicago, IL.

107.  At approximately 9:10 a.m., SA Dellamura observed a gray colored Chevy Tahoe bearing West Virginia tag 4WU201 driving south on Mission Road, Harpers Ferry, WV in the vicinity of Gate One Road, Harpers Ferry, West Virginia. (NOTE: At that time, SA Dellamura could not determine how many people occupied the vehicle.)

108.  At approximately 9:15 a.m., SA Dellamura observed this vehicle turn onto Shagbark Lane and arrive at 269 Shagbark Lane, Harpers Ferry, WV. A white female exited the front passenger side of the Tahoe carrying a large white colored plastic trash bag.  The white female proceeded to walk onto the deck of the residence and go to the door on the far right side.

109.  SA Dellamura then observed a white male exit the driver's side of the vehicle and proceed to the deck and met with the white female.  At first they could not open the door.  Eventually they opened the door.  They both then entered the residence. The white male returned to the vehicle and retrieved a large blue and white cardboard box and re-entered the residence through the same right hand side door. The white male then exited the house empty handed and returned to the vehicle where he retrieved a large black suitcase (roll-away type) and re-entered the house.  Shortly after, surveillance was terminated.  I believe based on these calls and physical surveillance that, MCDERMOTT went to Chicago to pick up two kilograms of heroin and brought it back

to his residence, 269 Shagbark Lane, to later give to BRYANT in order for it to be distributed throughout Baltimore, MD.

110.   On March 28, 2014, at approximately 2:14 p.m., Timothy MCDERMOTT, utilizing MCDERMOTT TELEPHONE #2, received an incoming text message from telephone number 443-867-7279, utilized by James BRYANT. The content of the message was "I'm running bhind eta 3:30 ok I hit u soon sorry."

111.   I believe, based on my knowledge, training, and experience that in this text message BRYANT is telling MCDERMOTT that he is on his way to West Virginia and is running a little late but should be there around 3:30 p.m.

112.   On March 28, 2014, at approximately 2:47 p.m., MCDERMOTT, utilizing MCDERMOTT TELEPHONE #2, sent an outgoing text message to telephone number 443-867-7279, utilized by James BRYANT. The content of the message was "Ima b at gas station in ten or 15 min."

113.   I believe, based on my knowledge, training, and experience that in this text message, MCDERMOTT is informing BRYANT that he will be at a gas station in ten to fifteen minutes. I believe that this is a location that BRYANT and MCDERMOTT have met in the past.

114.   On March 28, 2014, at approximately 2:47 p.m., MCDERMOTT, utilizing MCDERMOTT TELEPHONE #2, sent an outgoing text message to telephone number 443-867-7279, utilized by James BRYANT. The content of the message was "Hey big boy Down South tryin to get in touch wit u."   I

115.   I believe, based on my knowledge, training, and experience that in this text message, MCDERMOTT is trying to get a hold on BRYANT and is trying to inform

51

BRYANT that the "big boy down south" has been trying to reach him. I believe that MCDERMOTT is referring to BROOKS as the "big boy down south."

116.   On March 28, 2014, at approximately 3:15 p.m., Special Agent (SA) Mike Dellamura established surveillance near the area of 269 Shagbark Lane, Harpers Ferry, WV. Shortly after, SA Dellamura observed MCDERMOTT'S vehicle, a White 2002 Ford Windstar bearing West Virginia tag 4UE347, traveling northbound on Mission Rd., Harpers Ferry, WV. (NOTE: This vehicle is registered to Timothy MCDERMOTT, 269 Shagbark Lane, Harpers Ferry, WV.) MCDERMOTT was followed to the SHEETZ Gas Station, 1130 Marlowe Rd., Charles Town, WV 25414. At approximately 3:45 p.m., SA Dellamura observed MCDERMOTT park in the parking lot of the SHEETZ gas station. Shortly after, SA Dellamura observed MCDERMOTT enter the gas station "indoor market area." (NOTE: At that time SA Dellamura was unable to observe MCDERMOTT.) Minutes later, SA Dellamura observed MCDERMOTT sitting in the driver's side of his vehicle with an unknown black male sitting in the passenger side, later identified as James BRYANT. SA Dellamura then observed MCDERMOTT drive his vehicle to the rear of the SHEETZ Gas Station and park in the parking lot of a Tractor Supply Company located at 1040 Somerset Blvd., Charles Town, WV.  At that time, SA Zamudio arrived at the SHEETZ Gas Station. SA Dellamura then observed BRYANT exit MCDERMOTT'S vehicle with a dark colored plastic bag in his hand which was about the size of a softball. SA Dellamura observed BRYANT enter the driver's side of a 2000 Maroon Chevrolet Pick-up Truck bearing Maryland tag 34X809. (NOTE: This vehicle is registered to James Wilbur BRYANT JR., 128 N. Hilton Street, Baltimore, MD 21229.) At that time, BRYANT and MCDERMOTT both departed the SHEETZ Gas

52

Station heading east on Route 304, in Charles Town, WV. SA Dellamura and SA Zamudio began to follow BRYANT. During the surveillance of BRYANT, both SA Dellamura and SA Zamudio observed BRYANT conducting counter-surveillance techniques. BRYANT then continued on Route 304 to I-70 into Maryland. At that time, investigators contacted the Maryland Transportation Authority Police in order to establish their own probable cause to initiate a traffic stop on BRYANT. At approximately 5:00 p.m., Senior Officer (Sr. Ofc.) Day, observed BRYANT'S vehicle at exit 91(A) which is the exit ramp from Route 70 East to MD 695 South. Sr. Ofc. Day, initiated a traffic stop for an equipment violation. Sr. Ofc. Day identified the operator by a picture Maryland driver's license as James Wilbur BRYANT JR. Sr. Ofc. Day observed possible criminal indicators through BRYANT'S body language during his interview with BRYANT and requested a narcotics K-9 to scan BRYANT'S vehicle. Ofc. Keightley arrived with his K-9 Ace and conducted a narcotics scan of the vehicle. The K-9 alerted positively for the presence of narcotics in and around the vehicle. At that time, a probable cause search was conducted. An orange "Ramset" toolbox was located in the left rear corner of the bed near the tailgate. Inside of the toolbox and under a top removable portion of the toolbox were two large green cellophane wrapped rectangular bricks. Inside of each rectangular green cellophane wrapped bricks was a brownish powdery substance of suspected heroin. BRYANT was then placed under arrest and read his Miranda rights, BRYANT stated he understood his rights. A field test was done on each brick. The field test indicated a positive result for heroin. Brick #1 weighed approximately 2.9 pounds, Brick #2 weighed approximately 2.6 pounds.

117.  BRYANT was arrested and charged in Baltimore County, Maryland. He was subsequently released on bail.

118.  On June 10, 2014, at approximately 10:49 a.m., Baltimore County Detective Ness #5182 arrived to the rear of 128 N. Hilton Street Baltimore, Maryland 21229 to conduct surveillance.  128 N. Hilton Street is owned by James BRYANT and Lashawn Bryant.  At approximately 11:03 a.m., Detective Ness #5182 observed James BRYANT JR. exit the rear door of 128 N. Hilton Street Baltimore, Maryland 21229 with a mountain bicycle.  BRYANT put the bicycle in the bed of his maroon 2000 Chevrolet Silverado (MD- 34X809).  BRYANT walked back into 128 N. Hilton Street. At approximately 11:11 a.m., Detective Ness observed BRYANT exit 128 N. Hilton Street carrying a black trash bag and a rake.  BRYANT put those items in the back of his Chevrolet Silverado.  BRYANT then re-entered 128 N. Hilton Street.

119.  At approximately 11:13 a.m., Detective Ness observed BRYANT exit 128 N. Hilton Street carrying a loaded down black duffle bag and placed it inside his Chevrolet Silverado. BRYANT moved his red 1999 Ford Explorer (MD- 7BB4137) to a different spot in the alleyway. At approximately 11:15 a.m., BRYANT  left the area driving his Chevrolet Silverado.  Detective Ness surveiled BRYANT from the area. At approximately 11:30 a.m., Detective Ness and Detective Griffin observed BRYANT park his vehicle at the curb in front of Delcid Corporation at 3200 James Street Baltimore, Maryland 21230.  Detective Ness momentarily lost sight of BRYANT while establishing a surveillance position. At approximately 11:32 a.m., BRYANT walked back to his Chevrolet Silverado and drove it to the rear of Delcid Corporation.

120. At approximately 11:42 a.m., TFO Leimbach and TFO Shutt arrived on scene. TFO Shutt observed BRYANT in the rear of Delcid Corporation. TFO Shutt observed BRYANT conversing with unknown subjects and washing a white Freightliner tractor trailer bearing U.S.D.O.T. # 191915. TFO Shutt observed BRYANT retrieve an unknown amount of U.S. Currency from the black duffle bag carried out of 128 N. Hilton Street and hand it to an unknown black male subject.

121. At approximately 12:59 p.m., Detective Ness observed BRYANT retrieve his bicycle from his Chevrolet Silverado and attach it to the rear of the white tractor trailer cab area. BRYANT drove the white tractor trailer to the front of Delcid Corporation and exit the vehicle. BRYANT then walked back to his Chevrolet Silverado and parked it out front of Delcid Corporation on James Street at the curb. BRYANT then sat in his Chevrolet Silverado on his cellular telephone.

122. At approximately 1:13 p.m, Detective Ness and Griffin observed BRYANT exit his Chevrolet Silverado and re-enter the white tractor trailer vehicle and left the area. At approximately 1:30 p.m., Sergeant Bob Marley and Sergeant Rick Barbato observed BRYANT parke at the curb at Halethorpe Farms Road and Hollins Ferry Road Baltimore, Maryland 21227. BRYANT exited the white Tractor Trailer and walked into a truck service center. Shortly after, BRYANT exited the truck service center and pulled the white tractor trailer into the parking lot of the truck service center. BRYANT retrieved his bicycle from the back of the white tractor trailer and rode around the parking lot. At approximately 3:23 p.m., BRYANT left the area on his bicycle on Hammonds Ferry Road. At approximately 3:36 p.m., Detective Ness and TFO Leimbach observed BRYANT arrive back to his Chevrolet Silverado in front of Delcid Corporation

on James Street Baltimore, Maryland 21230. James Bryant Jr. and drove it to the rear of Delcid Corporation. At approximately 3:43 p.m., BRYANT left the area in his Chevrolet Silverado.

123. At approximately 4:00 p.m., BRYANT arrived at the Baltimore City sanitation yard at 6101 Bowleys Lane Baltimore, Maryland 21206. Investigators couldn't obtain a vantage point of the property and James Bryant Jr. left on Bowleys Lane towards Sinclair Lane. At approximately 4:14 p.m., BRYANT parked at the curb at Lyndale Avenue and Shannon Drive Baltimore, Maryland 21213. SA Zamudio observed James Bryant Jr. pushing his bicycle into 3905 Shannon Drive. 3905 Shannon Drive is owned by Charles Moore. At approximately 4:43 p.m., surveillance was terminated.

124. NOTE: TFO Shutt conducted a records check of BRYANT and learned that in 2008 he was stopped on U.S. Interstate 95 for a vehicle equipment violation. TFO Shutt learned that this vehicle was a 1996 Freightliner tractor trailer bearing Maryland registration 5TTF78. A check through Maryland MVA revealed no records on file for that registration. TFO Shutt also learned that BRYANT was stopped and cited on Interstate 70 in 2010 by Maryland State Police for an equipment violation. TFO Shutt learned that the vehicle was a 1996 Freightliner tractor trailer bearing Maryland registration 571F78. Again, there were no records on file through the Maryland MVA for this registration. TFO Shutt learned that the VIN for this tractor trailer was 1FUYDZYBXTP769501. A check throuth MVA revealed that this was a 1996 Freightliner tractor trailer owned by James Wilber BRYANT. TFO Shutt learned that registration for this vehicle was last on file in 2004.

125. Based on the investigation, I know that BROOKS uses individuals to transport large quantities of heroin by vehicle. Based on BRYANT's use of cash to pay individuals cleaning the Freightliner and the extensive cleaning of the Freightliner, I believe that BRYANT was readying the Freightliner to transport drugs.

126. Based on the foregoing, and additional information contained later in this affidavit, I respectfully submit that probable cause exists to believe that Timothy MCDERMOTT and James BRYANT are engaged in a conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin. I further submit that probable cause exists to believe that the SUBJECT PREMISES and vehicles described above may contain evidence relating to BRYANT'S illegal drug activities including, illegal weapons, documents, and/or cellular phones.

### SUBJECT PREMISES #6 and Vehicle

Location:                9007 Balin Court, Pikesville, MD 21208

Target Subject(s):    Carvell Larry JONES JR. FBI# 435428JA8

Vehicle(s): 2011 Lexus Maryland Tag 2BE6633 VIN# JTHBK1EG4B2454966

127. On June 15, 2014 at approximately 10:34 p.m., Sean WILSON, utilizing WILSON TELEPHONE #2, sent an outgoing text message to BROOKS TELEPHONE #4. The content of this message was, "391060p 68000t 459060." I believe that Sean WILSON is texting BROOKS the amount of money that was made from recent drug sales. I believe that "391060" is the sum of one set of drug sales, "68000" is another sum of a set of drug sales and "459060" is the total of the two.

128.    On June 16, 2014 at approximately 6:30 a.m., Sean WILSON, utilizing WILSON TELEPHONE #2, received an incoming text message from BROOKS TELEPHONE #4. The content of this message was "They there." At approximately 6:47 a.m., Fred BROOKS, utilizing BROOKS TELEPHONE #4, received an incoming text message from WILSON TELEPHONE #2. The content of this message was "Ok cuz be there 7." At approximately 6:51 a.m., Fred BROOKS, utilizing BROOKS TELEPHONE #4, received an incoming text message from WILSON TELEPHONE #2. The content of this message was "He say he there."

129.    I believe that the above text message conversation occurring on June 16, 2014 between WILSON and BROOKS is concerning unknown individuals traveling to a pre-determined meet location in order to pick up the money (see text message from WILSON to BROOKS on June 15, 2014 at approximately 10:34 p.m.) on BROOKS behalf. WILSON is directing an individual known as "Cuz," later identified as Carvell JONES, to meet with these individuals and provide them with the money on WILSON's behalf.

130.    On June 16, 2014 at approximately 6:56 a.m., Sean WILSON, utilizing WILSON TELEPHONE #2, completed an outgoing call to BROOKS TELEPHONE #4. During this conversation WILSON stated, "Cuz said ain't nobody pulled up yet." BROOKS responded, "Oh ok. They went to get a cup of coffee cause I didn't know if you all was there." WILSON stated, "Oh alright." BROOKS stated, "I told that you all…" WILSON stated, "See I didn't know he was there. But I told him seven. But he hit me and said he was there." BROOKS responded, "Yeah. Yeah. Ok." WILSON asked, "Hey um, I, I had a little problem yesterday." BROOKS asked, "What

happened?" WILSON stated, "Um, my man, he wanted to hold, my main horse man, he went to a cook out yesterday he said man, a nigger broke into his house and took all his shit. All his watches, all his money, took his girl pocket books. He owed me like thirty, thirty seven." BROOKS responded in the positive. WILSON stated, "He had owed me like thirty seven. But, um, I mean he my main, I'm just saying he going to get it right but it's just fucked up man. He said they didn't even tear his house up. But his watches were out. And they got about four hundred thousand dollars worth of watches." BROOKS stated, "Damn!" Both individuals continue to talk about the details of the burglary.

131.    During the first part of June 2014 TFO Shutt was in constant contact with a confidential informant (CI). During these communications, TFO Shutt asked if the CI was familiar with anyone that WILSON would refer to as "Cuz", or "Cousin", and who was gainfully employed (details that investigators have learned through intercepted communications between WILSON and BROOKS).   The CI stated that he/she knew of an individual named Carvell JONES who he/she knows that WILSON refers to as "Cuz". Investigators know this individual from the investigation conducted on WILSON thus far. Investigators know that JONES was arrested with WILSON in 1990 for Conspiracy to distribute heroin and cocaine.   JONES received a 188 month Federal sentence for his role in that conspiracy.  Through law enforcement databases investigators learned that JONES is currently working for Coca-Cola and resides at 9007 Balin Court, Pikesville, Maryland.  BGE records indicate that the property is occupied by Carvell JONES. Investigators know that this apartment is part of "The Courts of Avalon", a private apartment community, where electronic surveillance of Phillip WHEELER revealed that he had traveled to the area of "Pellinore Court", part of this same community.

Investigators also know that on June 5, 2014 surveillance was conducted on Sean WILSON, where he was observed to park his vehicle on "Pellinore Court" and was observed leaving one of the residences between buildings "13 and 14".

132.   On June 16, 2014 at approximately 5:00 a.m., TFO Shutt conducted a spot check of the area of 9007 Balin Court, Pikesville, Maryland in reference to the anticipated money pick up that had been arranged by WILSON and BROOKS.  At that time TFO Shutt observed a dark colored Lexus bearing Maryland registration 2BE6633. A check of the Maryland Motor Vehicle database revealed that this Lexus is registered to Carvell JONES at 9007 Balin Drive.  At this time TFO Shutt directed investigators assisting with surveillance to conduct stationary surveillance on the vehicle.

133.   At approximately 6:30 a.m., investigators observed a black male exit the front door of 9007 Balin Drive, and make contact with the trunk area of the Lexus bearing Maryland registration 2BE6633.  The unknown male then began to walk away from the vehicle on foot.  Investigators began to attempt to follow the male on foot, but was unable to due to the close proximity of the apartment buildings.

134.  Based on the foregoing, and additional information contained later in this affidavit, I respectfully submit that probable cause exists to believe that Carvell JONES and Sean WILSON are engaged in a conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin.  I further submit that probable cause exists to believe that the SUBJECT PREMISES and vehicles described above may contain evidence relating to JONES' and WILSON'S illegal drug activities including, narcotics paraphernalia, documents, and/or cellular phones.

60

**SUBJECT PREMISES #7**

Location:             14 Pellinore Court, Pikesville, MD

Target Subject(s):    Carvell JONES FBI# 435428JA8
                      Sean WILSON FBI # 534565KA9

135.    On June 29, 2014, at approximately 8:44 a.m., BROOKS, utilizing

BROOKS TELEPHONE #4, sent an outgoing text message to telephone number (312)

448-1957, a phone utilized by Sean WILSON. The content of the message was, "They

stopping by tomorrow can you ask cuz to get country docs." I believe that BROOKS is

asking WILSON to make sure Carvell JONES (CUZ) picks up the money from drug

proceeds that James BRYANT (COUNTRY) has put together.

136.    On June 29, 2014, at approximately 7:34 p.m., Fred BROOKS, utilizing

BROOKS TELEPHONE #4, received an incoming call from telephone number 312-448-

1957, utilized by Sean WILSON.  BROOKS stated, "Po po!!" WILSON responded,

"Yooooo!" BROOKS stated, "What's up man?" WILSON responded, "What's goin on

you still down there?" BROOKS stated, "Yea I'm getting ready to leave at 5 o'clock in

the morning to come back." I know that BROOKS is currently visiting the Miami beach

area of Florida. WILSON responded, "Ok ok...(unintelligible)...Yo?" BROOKS stated, "I

uh, uh, figured out where the um, my issue, is coming from. WILSON asked, "For real?"

BROOKS stated, "Yeah.  Man nigga's ain't shit, man I hate these niggas.  I'm ready to

join the god damn um Klu Klux Klan (inuadible). WILSON asked, "Who's it from?" BROOKS stated, "Down, down where the Mardi Gras at." WILSON responded, "Oh man." I believe that during this part of the conversation, BROOKS is explaining to WILSON that he has learned that law enforcement is activiely investigating him ("my issue"). I believe that BROOKS goes onto explain that someone from New Orleans, Louisiana ("Mardi Gras") is cooperating with law enforcement.

137.    The conversation continues with BROOKS providing details of his perceived legal issues. WILSON asked, "Are you going to have a legal problem?" BROOKS stated, "Yeah. I mean just, but it's there. The lawyer said it going to be about, I'm looking about a dime." WILSON asked "For you?" I believe that during this part of the conversation WILSON confirms with BROOKS that he believes he has pending criminal charges ("legal issues"). I believe that BROOKS explains to WILSON that he has already made contact with a lawyer and that he was advised that he is facing about ten years in prison ("dime"). The conversation continues about the details of the problem. WILSON asked, "What about the dude that got, that got hit up this way though?" BROOKS stated, "That was just off of the, just them off of the uh, off the, off of them phones." WILSON responded in the positive. I believe that during this part of the conversation BROOKS explains to WILSON that law enforcement was able to arrest James BRYANT (...dude that got, that got hit up this way") because of an active Title III intercept over members of the BROOKS' DTO's telephones ("off of them phones").

138.    The conversation continues in reference to who should represent BROOKS in his pending legal issues. WILSON then asked, "Hey what time are they gonna come early tomorrow?" BROOKS asked, "Huh?" WILSON asked, "They, they

coming early tomorrow?" BROOKS stated, "Hold on a second. Let me call you right back." I believe that during this part of the conversation WILSON is asking BROOKS what time the unknown individuals will arrive at the predetermined meet location (14 Pellinore Court, Pikesville, Maryland) to pick up the money owed for the drug debt. BROOKS advises WILSON that he will call him right back.

139.   On July 29, 2014 at approximately 7:43 p.m., BROOKS, utilizing BROOKS TELEPHONE #4, sent an outgoing text message to telephone number 312-448-1957, utilized by Sean WILSON. The content of the message was "4pm". I believe that this text is BROOKS advising WILSON what time the individuals will be arriving to obtain the drug funds.

140.   On July 29, 2014 at approximately 7:44 p.m., Fred BROOKS, utilizing BROOKS TELEPHONE #4, made an outgoing call to telephone number 312-448-1957, utilized by WILSON. During this conversation WILSON stated, "If this was a worser situation, you'd probably have to take off." BROOKS responded, "Yeah. That's why I'm saying, it ain't, you know, I'm trying to figuring if I should just face it; don't you think?" WILSON responded in the positive. BROOKS stated, "Maybe I can get it down to a nickel or something." WILSON responded, "Oh yeah, yeah, yeah, that would be nothing." I believe that during this part of the conversation that WILSON was asking BROOKS if he was thinking about leaving and becoming a fugitive. BROOKS replies that he believes that he is going to face the charges, and that he believes he can obtain a sentence of approximately five years ("nickel").

141.   The conversation continues with BROOKS explaining his legal problems. BROOKS stated "This explains everything." WILSON asked "Even with the, uh, the

63

two (inaudible)." BROOKS stated "Guess what, they knew the white boy, they knew him, and they knew the faggy boy. And that's who they got up on." I believe that during this part of the conversation BROOKS continues to talk about his concerns about a on-going law enforcement investigation into him and his drug trafficking organization. BROOKS advises WILSON that he believes that law enforcement were intercepting ("who they got up on") Timothy MCDERMOTT ("white boy") along with Phillip WHEELER ("faggy boy"). Further into the conversation WILSON asked "You still got your uh, the other little thing? The email thing?" BROOKS replied in the positive. WILSON stated "We probably have to go back to them." BROOKS stated "Yeah. Oh yeah definently. Yeah they uh, this here, this is just you and me, but I agree." I believe that during this part of the conversation BROOKS and WILSON agree that they need to switch the method of which they communicate from cellular telephones back to an email system to avoid further detection by law enforcement.

142. On June 30, 2014, at approximately 12:00 p.m., investigators began surveillance of 9007 Balin Court, Pikesville, Maryland along with Pellinore Court, Pikesville, Maryland in reference to the intercepted calls between BROOKS and WILSON the previous day in reference to a possible money transfer.

143. At approximately 3:30 p.m., TFO Shutt was notified by surveillance team members that they had observed Carvell JONES (Cuz) exit 9007 Balin Court, Pikesville, Maryland. JONES was followed on foot to the unit block of Pellinore Court. At this time, TFO Shutt observed JONES to take an extremely long route of travel to building number 14. TFO Shutt believed JONES to be engaged in counter-surveillance. TFO Shutt observed JONES to walk to the rear of the building and enter into apartment door

64

"14".    Leasing records from the property management company indicate that the apartment is leased to Mario Holmes and Maxxum Management Group LLC.

144.    At approximately 4:00 p.m., investigators observed WILSON, operating a dark colored Jeep Cherokee, enter the parking lot of the unit block of Pellinore Court, Pikesville, Maryland. At this time, WILSON was observed walking around the opposite side of building number 14. TFO Shutt observed WILSON to begin running in place, then to do several jumping jacks, while scanning the area of the rear of the building. TFO Shutt is aware that a frequent jogging path runs through the rear of this building and believed that WILSON was engaged in counter-surveillance. TFO Shutt observed WILSON checking the parking lot area of the building before running into Apartment "14".

145.    At approximately 4:07 p.m., TFO Shutt observed WILSON exit Apartment "14", and again walk the long way around the building to his vehicle. Surveillance members observed WILSON to enter his vehicle and leave the area.

146.    At approximately 4:34 p.m., and 4:36 p.m., WILSON, utilizing telephone number 312-448-1957, completed two calls to Fred BROOKS. Both of these attempted calls went to voicemail in a manner that I believed through my training, knowledge, and experience to indicate that the cellular telephone was powered off.

147.    A brief time later, TFO Shutt observed JONES exit Apartment "14" and walk around the front of the building. TFO Shutt believed that WILSON was suspicious of BROOKS phone being powered off during the time of a planned money transfer and advised JONES to leave the area. TFO Shutt believed at this time that JONES was going to leave the area with money or drugs, and advised an arrest team to arrest JONES.

65

JONES was able to travel out to Iron Horse Lane (approximately 250 yards from the front door of Apartment 14. TFO Shutt believed that if other individuals were inside of the residence at the time that they would be alerted to JONES arrest and begin to destroy drug evidence. TFO Shutt, along with other members of the arrest team made a forced entry into the residence and secured the residence for a pending search and seizure warrant. While securing the residence, TFO Shutt observed in plain view a large mirror in the living room area that was covered in a white powder residue. TFO Shutt believes through his training, knowledge, and experience as a CDS investigator that this residue was heroin. TFO Shutt also observed in the master bedroom closet floor, an electronic money counter.

148.   Based on the foregoing, and additional information contained later in this affidavit, I respectfully submit that probable cause exists to believe that Carvell JONES and Sean WILSON are engaged in a conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin. I further submit that probable cause exists to believe that the SUBJECT PREMISES and vehicles described above may contain evidence relating to JONES' and WILSON'S illegal drug activities including, narcotics paraphernalia, documents, and/or cellular phones.

149.  WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for each of the SUBJECT PREMISES and authorize the search and seizure of the items described in the respective attachments hereto. I further request authority to execute these warrants after 10 p.m., due to the risk that evidence could be destroyed if the warrants are not executed until the morning.

_____
Michelle Zamudio
Special Agent
Drug Enforcement Administration


                                    _____
                                    Honorable Judge Stephanie A. Gallagher


        Sworn to before me this <u>1st</u> day of <u>July,</u> 2014 at _____ hours.


67

### Exhibit #1

Based upon your affiants training and experience and my participation in CDS trafficking investigations as well as my conversations with other agents, I know the following:

Your affiants know from the training, knowledge and experience in CDS trafficking investigations that evidence of involvement in the drug trade is likely to be found where dealers reside. Your affiants know from the training, knowledge and experience in CDS trafficking investigations that such evidence may take the form of CDS, CDS paraphernalia and packaging, diluents or "cutting agents", CDS proceeds, firearms and ammunition, "tally or "owe" sheets and other ledgers, documents and records maintained in furtherance of the CDS trafficking trade.

CDS traffickers often maintain on hand large amounts of both CDS and currency in order to maintain and finance their on-going CDS business, as well as paraphernalia used in the manufacture, packaging, preparation, and weighing of illegal CDS in preparation for trafficking, and CDS in preparation for trafficking, and CDS traffickers maintain these items where they have ready access to it.

CDS traffickers often maintain financial records and financial instruments related to their CDS transactions and the profits derived from those transactions including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stock, bonds, precious metals, and real estate records;

CDS traffickers frequently maintain records of their CDS transactions including, but not limited to, books, ledgers, records and other documents relating to the manufacture, transportation, possession and distribution of controlled dangers substances.

68

Such documents are frequently maintained where the traffickers have ready access to them, including in their homes;

CDS traffickers commonly maintain books, records and other documents that identify and contain the names, addresses and or telephone or pager numbers of associates in their CDS-trafficking or money laundering activities, including, but not limited to: address books, telephone books, rolodexes, telephones, pagers, or personal digital assistants with stored telephone information, notes reflecting telephone and pager numbers, photographs (to include still photographs, negatives, movies, slides, video tapes, and undeveloped film), and audiotape recordings of conversations, including those made over telephone answering machines.

CDS traffickers commonly maintain identification and travel documents, including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, and motel/hotel receipts;

CDS traffickers commonly maintain firearms, ammunition, magazines for storing and loading ammunition, gun boxes, holsters, gun parts, shell casings, items used to clean and maintain firearms-related documents, and other indicia of gun possession; Indicia of occupancy, residency and/or ownership of the premises to be searched are often present in such premises;

CDS traffickers commonly maintain many of the foregoing items in computer files; and Narcotic traffickers commonly maintain the foregoing items inside combination or key-lock safes or strong boxes, suitcases, locked cabinets and other types of locked or closed containers, hidden compartments, which are secreted in locations such as the SUBJECT PREMISES, where the may maintain these items securely.

## Attachment A

### Items to be Seized

a. Controlled dangerous substances (CDS) and paraphernalia used in the manufacture, preparation, packaging, or weighing of CDS in preparation for distribution, including, but not limited to, scales, packaging materials, and other chemical agents used to mix with CDS;

**Attachment B**

**Items to be Seized**

a.  Records of drug transactions including, but not limited to, books, ledgers, receipts, notes, and other papers relating to the manufacture, transportation, possession, and distribution of CDS and the profits derived from those transactions;

b.  Financial records, financial instruments and other records or documents reflecting drug-trafficking activity or the disposition of drug proceeds, including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks, bonds, jewelry, precious metals, and bank and real estate records;

c.  Books, records and other documents that identify other co-conspirators, including, but not limited to: address books, telephone books, rolodexes, and notes reflecting telephone and pager numbers, and audiotape recordings of conversations, including those made over telephone answering machines;

d.  Telephones, pagers, and personal digital assistants and any names, addresses, telephone numbers, and codes stored therein, and indicia of ownership of these communications devices, including boxes, manuals, chargers, receipts, and phone bills;

e.  Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

f.  Photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film);

g.  Records of travel including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, luggage tags, and motel/hotel receipts;

71

h.  Identification documents;

i.  Indicia of occupancy, residency, ownership or lease of the premises, including but not limited to keys, photographs, utility and telephone bills, other mail, and other documents; and

j.  Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, storage lockers, safety deposit boxes, locked cabinets and other types of locked or closed containers, and hidden compartments that may contain any of the foregoing.

## Attachment C

### Items to be Seized

a. Computers with stored financial, telephone, or other information, including the following:

(1)      computers; central processing units; external and internal drives; external and internal storage or transmission equipment or media; terminals or video display units; optical scanners; computer software; computerized data storage devices, including data stored on hard disks (including CD ROMs) or floppy disks, computer printouts or computer programs; computer or data processing software or data, including: hard disks (including CD ROMs), floppy disks, together with peripheral equipment such as keyboards, printers, modems or acoustic couplers, infrared transmitters, and magnetic tapes which could contain or be used to transmit or store any of the foregoing records, documents, and materials;

(2)      records, documents, and materials which refer, relate to, or are for use in connection with the premises to be searched.  As used herein, the term "records, documents, and materials" includes records, documents, and materials created, modified or stored in electronic or magnetic form and any data, image or information that is capable of being read or interpreted by a computer; and

(3) records, letters, papers, notes, e-mail, and other documents and information, including records, files, and data – in whatever format, including digital – inside the premises to be searched or stored on any computer system inside the premises to be searched, that may assist in identifying the person or persons who use any computer found within the premises to be searched.

73